**Adib ZAKY, M.D., Plaintiff-Appellant,**

v.

**UNITED STATES VETERANS ADMINISTRATION, James Woytassek, and Sun J. Guo, M.D., Defendants-Appellees.**

No. 85–1741.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 12, 1985.

Decided June 12, 1986.

Adib Zaky, M.D., Ft. Wayne, Ind., for plaintiff-appellant.

David H. Miller, U.S. Atty. Office, Ft. Wayne, Ind., R. Lawrence Steele, Jr., U.S. Atty., for defendants-appellees.

Before COFFEY, FLAUM, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

The plaintiff appeals the district court's grant of summary judgment to the defendant in his suit alleging that the Veteran's Administration discharged him in retaliation for the exercise of his First Amendment rights; violated his Fifth Amendment liberty interests; and effected the discharge in violation of his procedural rights guaranteed him by 38 U.S.C. § 4106(b), 605 F.Supp. 449. We affirm.

**I.**

On February 22, 1981, the plaintiff, Dr. Adib Zaky, was employed as a cardiologist at the Veteran's Administration Medical Center at Fort Wayne, Indiana, pursuant to 38 U.S.C. §§ 4104 and 4106. Dr. Zaky was appointed for a two year probationary period, as provided in § 4106. Dr. Zaky's work was to be reviewed by a Professional Standards Board ("PSB") during the probationary period and Dr. Zaky was subject to separation if the Board found that he was "not fully qualified and satisfactory."

On November 30, 1981, during Dr. Zaky's first year of probationary employment, a patient was admitted to the Intensive Care Unit ("ICU") as an emergency with severe bradycardia (slow heart beat). Although Dr. Zaky successfully "paced" the patient's heart by inserting a temporary pacing electrode, the patient remained unresponsive. Dr. Zaky concluded that the bradycardia was symptomatic of another serious medical problem and instructed the nurses to ask the internist to whom the patient was assigned to see the patient without delay and left the ICU. According to Zaky, "the Chief of Service [Dr. Venkatachala] accused me of abandoning this patient during a meeting at the Medical Service on December 1, 1981."

On December 3, 1981, some two days later, Dr. Zaky wrote a memorandum to Dr. Haan, the Chief of Medical Service and Dr. Venkatachala's supervisor, pointing out deficiencies in the resuscitation procedures in the ICU and suggesting that the Medical Center: (1) "start a regular, ongoing in-service drills involving simulated, cardiac emergencies, in particular, potentially fatal arrythmias;" and (2) "discuss and review each real live resuscitation procedure in CPR committee meetings." Zaky alleged in the memorandum that he had made these suggestions on numerous occasions, but neither suggestion had been implemented.

The record reveals that following the incident with the bradycardia patient and Dr. Zaky's letter to Dr. Haan, Dr. Zaky experienced difficulty in his relations with the Medical Center staff. Dr. Zaky failed to attend ICU rounds from January 11, 1982, to March 17, 1982 because, in his opinion, the rounds had "degenerate[d] into personal criticisms that serve no beneficial medical purpose." Dr. Zaky specifically complained that "on January 8, 1982, ... I was personally insulted, and my medical education was questioned." When he resumed attending rounds in March, he stood at a distance from the other physicians and seemed to be unable to hear their discussion. If asked a question, he would ask that the question be repeated and would then request that the treating physicians repeat their earlier discussions concerning the patient's condition and problems before replying. The other physicians responded to this treatment by walking out of the room when Dr. Zaky presented his patients.

Furthermore, Dr. Zaky experienced difficulty in cooperating with other physicians and surgeons in his operation of the cardiac

lab. In early 1981, Dr. Zaky learned that the hospital was considering the appointment of an internist with expertise in the field of cardiology to the facility and accused Dr. Haan of "making plans to replace him." He objected to the hospital's granting cardiac privileges to another physician, a Dr. Krishnamoorthy, without consulting Dr. Zaky. When informed that Dr. Krishnamoorthy would receive privileges despite his protest, Dr. Zaky wrote a memorandum suggesting as a "solution" that Dr. Krishnamoorthy "understand ... he cannot exercise these privileges in defiance to the legitimate cardiologist or with disregard to his expressed opinion." On another occasion, Dr. Zaky allegedly exclaimed to a patient, "who is the damn doctor asking for a stress test on you? He must be a nut."

Official charges concerning Dr. Zaky's work at the Center, such as the incident involving the patient with bradycardia and his failure to attend rounds, were filed on December 1, 1981; March 15, 1982; April 9, 1982; and July 13, 1982. Dr. Zaky responded on each occasion with either a memorandum or an attempt to initiate a grievance proceeding. Dr. Zaky rejected the Veteran's Administration's attempt to have Zaky's supervisor counsel him by either walking out of the counseling meetings or insisting that all communications with him be in writing.

Dr. Zaky's first performance evaluation was conducted by Dr. Venkatachala on December 18, 1981, and his work was rated satisfactory. Dr. Venkatachala commented, however, that "in the area of interpersonal relationships with staff members and nursing personnel, he leaves much to be desired. If Dr. Zaky could be more flexible, considerate, and develop good lines of communication, everyone can derive more benefit from his expertise." Before Dr. Zaky received the report, it was reviewed by the Chief of Staff, Dr. Haan who, pursuant to his authority, lowered both Dr. Zaky's "Personal Qualities" rating to unsatisfactory and his "Overall Evaluation" rating to low satisfactory. Dr. Haan explained that he lowered the ratings be-

cause, in his opinion, "Dr. Zaky does not demonstrate good emotional stability." In addition to noting Dr. Zaky's objections to the Center's hiring an internist with cardiology training as "making plans to replace him," Dr. Haan stressed Dr. Zaky's poor staff relations:

"In regard to dependability, Dr. Zaky has been critical of our Intensive Care Unit and the nurses on ICU. He has also been critical of the CPR Program here. When invited by the Chief, Nursing Service, and by the Head Nurse, and the Intensive Care Unit to provide such training, Dr. Zaky's usual reply was that 'I am too busy' or 'Go ahead and schedule it, and I'll be there.' When the sessions were scheduled, Dr. Zaky seldom appeared.

His relations with the staff have deteriorated to the point that recently, I was requested by five members of the medical staff to listen to their pleas in regard to their relationship with Dr. Zaky. The gist of that conversation was that they are so unhappy that they are considering departing from the hospital unless some adjustment can be made in regard to their relationship with Dr. Zaky.

As a consequence of this, he is able to elicit little cooperation with other members of the medical staff and is unable to secure what I would consider effective cooperation from the nursing staff, since they are also somewhat uncomfortable with him by reason of his remarks to them at inappropriate times."

On March 15, 1982, a Professional Standards Board composed of Drs. Haan and Venkatachala, Dr. Sun Guo, Chief of Surgical Service, and Patrick McKinney of the Personnel Service, convened to conduct Dr. Zaky's first year review and concluded that "there was sufficient evidence [Dr. Zaky's] performance has been less than satisfactory." Following the review, the Professional Standards Board listed five specific deficiencies in Dr. Zaky's performance and suitability and recommended that a Summary Review Board be convened to determine whether Dr. Zaky should continue as

a member of the V.A. medical staff. Dr. Guo, as Chairman of the Professional Standards Board, informed Dr. Zaky of the five deficiencies in his performance and suitability by letter dated April 9, 1982:

"1. You have consistently failed to attend ICU rounds as requested.

2. You failed to communicate the condition of your patient to Dr. Gerding on February 25, 1982 (patient Navigato).

3. You failed to communicate with the primary physician concerning a severe bradycardia. (Incident occurred approximately November 30, 1981).

4. You have created difficulties with fellow physicians by your failure to accept valid criticism. You have made accusations that the Chief Medical Service is attempting to manipulate physicians. You have made rude and sarcastic remarks to Nursing Service Personnel resulting in their request to not be assigned to the Cardiac Laboratory.

5. You made derogatory comments about Dr. Smithivas to patient Marlin to the effect ... 'Who is the damn doctor asking for a stress test on you? He must be a nut.'"

On June 15, 1982, Dr. Guo informed Dr. Zaky that a Summary Review PSB previously scheduled to meet on April 15, 1982, would meet on July 14, 1982. The letter listed four new charges:

"5. On April 30, 1982, you were instructed to initiate, coordinate, present, and evaluate at least one educational program of mutual benefit to you and the Nursing ICU staff within 30 days. You failed to do so.

6. You were insubordinate to your Service Chief on April 30, 1982. Your Service Chief attempted to discuss with you your performance, you demanded it be given to you in writing saying 'I'm not a child, I don't need lecturing.' You then left the office refusing to allow your Service Chief to complete the counseling meeting.

7. You were insubordinate to your Service Chief on June 8, 1982. Your Service Chief attempted to have a counseling meeting with you on June 8, 1982. You interrupted saying, 'Anything you want to say, please give it in writing.' You were told it would be confirmed in writing, but your Service Chief wanted to discuss certain aspects with you. You again stated you wanted everything in writing and didn't want any discussion and left the office.

8. You were insubordinate to your Service Chief on June 10, 1982. You were at a meeting called by your Service Chief to discuss an incident involving you, Dr. Moorthy, Dr. Salomon, and Mr. Zimmerman. You stated you felt there was no problem, but you wanted it recorded. Your Service Chief agreed to have his secretary record it. You stated you wanted it tape recorded. You were told it was not possible and to stay for the meeting. You refused and left the office."

Dr. Zaky was also informed that he would have the opportunity to "appear in person before the Board to present your side of the case and/or submit a written statement in your behalf."

On July 14, 1982, the Summary Review PSB composed of Dr. Guo, Dr. Palileo, Chief of Laboratory, and Dr. Dorothy Weiner, Chief of Radiology Services, interviewed 11 witnesses and examined written statements submitted by Dr. Zaky. Dr. Zaky declined the opportunity to make an oral statement to the Board because there was no "verbatim recording of the procedure." The Summary Review PSB determined that all eight deficiencies were sustained by the evidence and recommended that Dr. Zaky be discharged. Dr. Zaky's file was transferred to the Veteran's Administration's Central Office along with letters from Dr. Haan and Mr. Woytassek, the Medical Center Director, counseling approval of the Summary Review PSB's recommendation of Dr. Zaky's separation. On August 25, 1982, while Dr. Zaky's case was pending in the Central Office, the Medical Center Director of the Fort Wayne facility suspended Dr. Zaky for insubordination.

According to the "Notification of Personnel Action" included in the record, Dr. Zaky "intentionally disobey[ed] a direct, proper order three times. On August 19, 1982, you were given a direct order by your Service Chief to complete a supervisory appraisal on an employee you supervise. You refused to do the appraisal. The order was repeated two more times, and you were informed by the Service Chief that this was a direct order, and your refusal would result in disciplinary action. After that warning, you again refused to complete the supervisory appraisal."

The Chief Medical Director informed the Fort Wayne Medical Center of his approval of Dr. Zaky's separation on September 16, 1982.

Zaky filed suit in the United States District Court for the Northern District of Indiana alleging, *inter alia,* that the Veteran's Administration discharged him in retaliation for his exercise of his First Amendment rights; violated his Fifth Amendment liberty interests; and effected the discharge in violation of his procedural rights guaranteed by 38 U.S.C. § 4106(b).[1]

The parties filed motions for summary judgment and the district court ruled that the First Amendment claim must fail because the plaintiff's statements "appear to have been made in the context of an employee protecting his job, a matter of personal interest. These are precisely the kinds of statements which the [Supreme Court in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ] held are not matters of public concern, and thus not entitled to protection in a federal court." As to the liberty interest claim, the district court "agree[d] with Dr. Zaky that a liberty interest is involved in a situation where the accusations against a probationary physician are potentially available to future employers." However, the court rejected the liberty interest claim, ruling

that Dr. Zaky received all the process that was due with the "opportunity to make his side of the story part of his permanent record." Finally, the court divided the § 4106 claim into two parts: allegations of procedural irregularities and an argument that the proceedings were not "fair and impartial" as required by the regulations. The court rejected the various arguments of procedural irregularities because: (1) alleged "irregularities," in fact, were authorized by the regulations; (2) Dr. Zaky claimed procedural rights that were not granted to him by the regulations; and (3) Dr. Zaky's charges were not supported by the evidence. Dr. Zaky's principal argument that the proceedings were not "fair and impartial" was that the presence of Drs. Venkatachala and Haan on the March 15, 1982, Periodic Review PSB undermined the fairness of the entire review process because of the alleged bias and prejudice both doctors felt toward the plaintiff. Noting that there are "three tiers of review for probationary employees" and that "each tier is procedurally independent of the other," the court rejected the plaintiff's argument because "a lack of impartiality on the part of a periodic review board would not affect the Summary Review PSB because the latter must independently find the deficiencies to exist." Moreover, the court pointed out that the presence of Drs. Haan and Venkatachala could not have biased the entire review process because the findings of the Summary Review PSB are reviewed by the Veteran's Administration's Central Office in Washington, D.C., before the Chief Medical Director approves or disapproves of the Summary Review PSB's recommendation. Dr. Zaky's second principal argument attacking the impartiality of the Board merely contended that the postponement of the Summary Review from April 15 to July 14, 1982 raised an issue as to the validity of the charges and the motives of those who made them. The court

---

**1.** Zaky failed to appeal the district court's rejection of his claims that his discharge was unlawful under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq;* Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq;* and

his claim that the decision to terminate his employment was arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

found that the delay did not undermine the fairness of the review proceedings because it gave Dr. Zaky additional time to "iron out his differences with his superiors."

## II.

### A. *First Amendment*

■ As an initial matter, we address Dr. Zaky's argument that "the trial court erred by avoiding consideration of plaintiff's claim that his request for a grievance hearing played a substantial and motivating role in the decision to discharge him." An examination of the record reveals that the plaintiff moved for partial summary judgment on his Fifth Amendment and § 4106 claims and that the defendant's motion for summary judgment focused on Zaky's statements concerning patient care rather than the request for a grievance hearing.

> "As we have recently emphasized, 'the district court need not investigate the evidence for arguments that might possibly support the plaintiff's claim; it was the *plaintiff's* responsibility to raise the *arguments* that it seeks to use now on appeal.' 'In our view, the trial judge may properly depend upon counsel to appraise him of the issues for decision. He is not obligated to conduct a search for other issues which may lurk in the pleadings.' "

*Erff v. MarkHon Industries, Inc.*, 781 F.2d 613, 618 (7th Cir.1986) *quoting Libertyville Datson Sales, Inc. v. Nissan Motor Corp.*, 776 F.2d 735 (7th Cir.1985) and *Desert Place, Inc. v. Salisbury*, 401 F.2d 320, 324 (7th Cir.1968). Since Zaky failed to present to the district court arguments and evidence supporting his theory that the defendants retaliated against him for requesting a grievance hearing, we hold that the district court did not err in failing to address this issue. Our review is confined to the plaintiff's argument that in finding that his statements were made as "part of an internal process of policy determination within the Medical Center," the court "excluded privately-expressed statements on medical issues from First Amendment protection." Additionally, we address Dr.

Zaky's contentions that the court erred in finding that his statements did not address a matter of public concern.

"[A] state cannot condition public employment on a basis that infringes the employee's constitutionally-protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). When public employees press claims alleging that their First Amendment rights were denied by a public employer, the court must strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). The courts' concern with protecting the First Amendment rights of public employees rests on the First Amendment goal of "assur[ing] unfettered interchange of ideas for the bringing about of political and social changes desired by the people. Speech concerning public affairs is more than self-expression; it is the essence of self-government." *Connick*, 461 U.S. at 145, 103 S.Ct. at 1689 (citations omitted).

■ Judicial oversight, however, is limited to protecting employee speech on matters of public concern.

> "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the State.

\* \* \* \* \* \*

While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs."

*Connick*, 461 U.S. at 147, 149, 103 S.Ct. at 1690, 1691. Indeed, courts addressing First Amendment claims by public employees must heed "the common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Id.*, at 143, 103 S.Ct. at 1688. In *Egger v. Phillips*, 710 F.2d 292 (7th Cir.1983), our court noted:

"[W]hile the employer has a general interest in maintaining a work environment conducive to effectuating the agency mission, under the *Pickering* calculus, certain aspects of the particular employment milieu are especially germain....: (1) The need to maintain discipline or harmony among co-workers; (2) the need for confidentiality; (3) the need to curtail conduct which impedes the [employee's] proper and competent performance of his daily duties; and (4) the need to encourage a close and personal relationship between the employee and his superiors, where that relationship calls for loyalty and confidence."

*Egger*, 710 F.2d at 319. *See also, Linhart v. Glatfelter*, 771 F.2d 1004, 1009 (7th Cir. 1985) ("The state or municipality may not punish an employee for speaking out on a matter of public concern provided that the government's interest in efficient operation does not outweigh the importance of the right to speak in the individual case."); *O'Brien v. Town of Caledonia*, 748 F.2d 403, 407 (7th Cir.1984) ("In *Connick* the court emphasized the government's legitimate interest in controlling employee's communications which are disruptive of internal operations. Furthermore, the public's interest in the subject matter of the communication was deemed to be of limited weight when the topic was primarily a private concern of the employee").

Thus, the focus of the court's inquiry is "whether the personnel action was based on legitimate personnel concerns or rather was based on a naked desire to punish an individual for expressing a certain point of view." *Egger*, 710 F.2d at 320.

"[T]he *Connick* test does not consist in looking at what might incidently be conveyed by the fact that an employee spoke in a certain way. The test requires us to look at the *point* of the speech in question: Was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?"

*Linhart*, 771 F.2d at 1010 (emphasis in original). To determine whether an employee's speech addressed a matter of public concern, the court must consider "the content, form, and context of the given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690. "The reasons behind an employment decision will not be scrutinized unless a speech or other conduct can be 'fairly characterized as constituting speech on a matter of public concern.' " *Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251, 1257 (7th Cir.1985), quoting *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689.

Initially, we addressed the plaintiff's argument that the district court "excluded privately-expressed statements on medical issues from First Amendment protection." An examination of the district court's analysis of the First Amendment claim reveals that the court in fact rejected an argument that quality of patient care is, *per se*, a matter inherently of public concern and held that the context of the statement must be considered in addition to the content, i.e., quality of patient care. The court determined that "Dr. Zaky's statements were made in the course of internal hospital business involving the determination of which procedures would be used at the Medical Center." The court concluded that because Dr. Zaky's comments were made as part of an internal process of

policy determination, they were not "a matter of public concern for precisely that reason, even though similar statements in a different context may have appealed to the public's general interest." Our review of this portion of the opinion reveals that the district court judge performed the analysis mandated by *Connick:* determining whether the point of the speech in question was to bring wrongdoing to light or merely to address internal office affairs. We discern no intent on the part of the district court judge to "exclude privately-expressed statements on medical issues from First Amendment protection."

■ Zaky attacks the district court's holding, that his speech was made during the course of an internal process of policy determination and that the majority of the statements were made in defense of the numerous complaints lodged against him, by arguing that the content of the speech, quality of patient care, outweighed the employer's interest in the efficient delivery of public services. Additionally, Dr. Zaky contends that he did not disrupt the functioning of the Medical Center when he presented his views. Initially, we note that Dr. Zaky, in effect, seems to be arguing that the importance of patient care is so great that his First Amendment interest in statements concerning quality of the patient care can *never* be outweighed by the employer's interest in efficiently delivering medical services. Dr. Zaky has not cited, and our research has failed to reveal, any legal authority for his proposition that speech concerning the quality of patient care *always* outweighs the employer's interests in a court's analysis of whether the speech is a matter of public concern. Moreover, an examination of the record reveals ample support for the district court's conclusion that the statements concerning quality of care were made in defense of numerous complaints against Zaky and were "statements ... made in the context of an employee protecting his job, a matter of personal interest." The memorandum to the Chief of Staff, Dr. Haan (who was Dr. Venkatachala's superior) was written two days after Dr. Venkatachala

charged Zaky with abandoning the patient with severe bradycardia. Indeed, the record is replete with complaints about Zaky's inability to communicate or cooperate with other members of the Medical Center staff. Further, Dr. Zaky's contention that he did not disrupt the functioning of the Center is negated by Dr. Haan's comment on his Proficiency Evaluation that "five members of the medical staff ... are so unhappy that they are considering departing from the hospital unless some adjustment can be made in regard to their relationship with Dr. Zaky." Based upon the numerous complaints about Dr. Zaky, evidence that his comments and behavior disrupted the functioning of the Medical Center and the fact that the resuscitation memorandum was written two days after Dr. Venkatachala charged Dr. Zaky with abandoning a seriously-ill patient, we hold that the district court correctly determined that Dr. Zaky's statements about the quality of patient care did not address a matter of public concern.

### B. *Fifth Amendment Liberty Interest*

Zaky argues that his "liberty was injured by separation and by allegations which harmed his good name, reputation, honor, and integrity." According to Zaky, the defendants' description of him as "emotionally unstable, undependable, unethical, insubordinate, unable to get along with all categories of personnel, nurses and doctors alike, to the extent that he caused disruption of the medical service in the cardiac lab," damaged his standing and associations in the medical community, branded him with a "badge of infamy" and "foreclosed his chances for federal and non-federal employment." The Supreme Court has held:

> "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount, but the range

of interests protected by procedural due process is not infinite."

*Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). We reviewed liberty interest claims in the context of federal employment in *Perry v. Federal Bureau of Investigation,* 781 F.2d 1294 (7th Cir.1986).

> "In the ... situation of a firing or failure to rehire a government employee, a liberty interest is implicated if 'either (1) the individual's good name, reputation, honor or integrity are at stake by such charges as immorality, dishonesty, alcoholism, disloyalty, communism or subversive acts or (2) the state imposes a stigma or other disability on the individual which forecloses other opportunities."

*Id.* at 1300 *quoting Munson v. Friske,* 754 F.2d 683, 693 (7th Cir.1985); *see also Hadley v. County of DuPage,* 715 F.2d 1238, 1244 (7th Cir.1983).

 Initially, we note that the district court failed to analyze the statements about Dr. Zaky to determine whether they impugned his moral character or diminished his future employment opportunities so significantly that his liberty interest in future employment was implicated. The court, instead of engaging in careful analysis, merely "agree[d] with Dr. Zaky that a liberty interest is involved in a situation where the accusations against a probationary physician are potentially available to future employers." According to the district court, Dr. Zaky's Fifth Amendment due process rights were satisfied by his opportunity to respond to stigmatizing statements in his personnel file. "The inclusion of Dr. Zaky's written statement to the Summary Review Professional Standards Board in the record guarantees Dr. Zaky that any future employer will have both sides of the story so that ... his opportunities for future employment will not be unconstitutionally limited." We cannot approve of the district court's assumption that a liberty interest is involved in a situation where "the accusations against a probationary physician are potentially available to future employers;" alleged vio-

lations of asserted infringements of a liberty interest of a discharged employee *must* be analyzed to determine whether statements concerning the employee, made during the discharge, either impugned the employee's moral character or diminished his future employment opportunities so significantly that his liberty interest in future employment was implicated. *Hadley v. County of DuPage,* 715 F.2d 1238 (7th Cir.1983). Indeed, the district court ignored numerous cases holding that "a liberty interest is not implicated merely by a reduction in an individual's attractiveness to potential employers." *Perry,* 781 F.2d 1302; *Roth,* 408 U.S. at 575 ("It stretches the concept of liberty too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another"); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 238, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957) ("not every negative effect upon one's attractiveness to future employers violates due process if it results without a hearing.") However, we need not reverse the district court because of its failure to analyze the magnitude of the effect of the remarks on the employee's chances of obtaining future employment in view of the fact that the district court correctly held that Zaky received all the process that was due. " '[W]hat procedures due process may require under any given set of circumstances' varies with a 'determination of the precise nature of the government function involved as well as the private interest that has been affected by governmental action.' " *Greene v. Finley,* 749 F.2d 467, 470 (7th Cir.1984) (quoting *Larry v. Lawler,* 605 F.2d 954, 959 (7th Cir.1978)). "The function of a due process hearing is 'to provide the person an opportunity to clear his name.' " *Perry,* 781 F.2d at 1303 *quoting Roth,* 408 U.S. at 573 n. 12, 92 S.Ct. at 2707 n. 12. The inclusion of the employee's denials and explanations in the memorandum containing the employer's allegedly objectionable statements may satisfy the employee's due process rights in that it "provides the person an opportunity to clear his name." *See Perry,* 781 F.2d at

1303. We agree with the district court's conclusion that the inclusion of Dr. Zaky's statement in the record protected his interests in preserving his reputation. Accordingly, even if we were to assume that the statements made during Dr. Zaky's discharge implicated his liberty interests in obtaining future employment, we hold that he received all the due process protection he was entitled to under the circumstances.

## C. *Section 4106*

■ Dr. Zaky raises numerous arguments in support of his position that he did not receive the fair and impartial proceeding mandated by 38 U.S.C. § 4106. A review of the district court's thorough and well-reasoned analysis of the § 4106 claim reveals that several of the plaintiff's arguments were not raised in the district court. Accordingly, we limit our discussion to those arguments that were presented to the trial court and renewed in this court: (1) whether the charges in the June 18, 1982 notice letter were vague, frivolous, and arbitrary; (2) whether the presence of Drs. Venkatachala and Haan on the March 15, 1982 periodic review PSB "undermined the fairness of the entire review process" because of their alleged bias and prejudice toward the plaintiff; (3) whether the delay of the Summary Review PSB from April 15, 1982 to July 14, 1982 undermined the fairness of the review process; and (4) whether the July 14, 1982 Summary Review PSB was impartial.

The district court reviewed the June 18, 1982 letter giving notice of the charges and found that the "letter specified both the date of the alleged deficient action by Dr. Zaky and a description of the specific acts which Dr. Zaky did. Thus, the allegations were not vague." The district court judge concluded that the charges were neither frivolous nor arbitrary because the Summary Review PSB had found all of the allegations sustained by the evidence. As to the argument that the presence of Drs. Haan and Venkatachala on the March 15, 1982 periodic review PSB "undermined" the fairness of the review process, the district

court noted that their presence could not undermine the entire review process because the regulations provided for three independent tiers of review and that the Summary Review PSB's recommendation must be approved by the Chief Medical Director in the Veteran's Administration's Central Office. Furthermore, the court rejected Zaky's argument that the postponement of the Summary Review PSB undermined the fairness of the review process, concluding that "it is clear that the postponement was effectuated for Dr. Zaky's benefit. It gave him additional time to iron out his differences with his superiors, and promised that the postponed review would consider his record up to the date of the review, so that if he exhibited improvement in his attitude and actions, the PSB would be able to review those facts." Finally, the court dismissed Zaky's allegation that the July 14, 1982 Summary Review PSB was not impartial, finding that "the members of the July 14, 1982 Summary Review PSB which actually began the separation process were not people who Dr. Zaky alleged harbored any potential prejudice against him. Thus, the court finds that no lack of fairness or impartiality influenced the decision to separate Dr. Zaky."

On appeal, Zaky failed to advance arguments demonstrating either factual or legal error in the court's analysis of these issues. Accordingly, we affirm the district court's conclusion that: (1) the charges in the June 18, 1982 notice letter were neither vague, frivolous, nor arbitrary; (2) the presence of Drs. Venkatachala and Haan on the March 15, 1982 periodic review PSB did not "undermine the fairness of the entire review process;" (3) the delay of the Summary Review PSB from April 15, 1982 to July 14, 1982 did not undermine the fairness of the review process; and (4) the July 14, 1982 Summary Review PSB was impartial.

The decision of the district court is AFFIRMED.