856 F.2d 1401
 5 Indiv.Empl.Rts.Cas. 447
 Barry H. ROTH, M.D., Plaintiff-Appellee,
v.
VETERAN'S ADMINISTRATION of the GOVERNMENT OF the UNITED
STATES, Defendant,
and
Charles I. Kaufman, M.D.; Peter Banys, M.D.; Nick Kanas,
M.D., Defendants- Appellants.
 No. 87-2214.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 10, 1988.
Decided Sept. 12, 1988.
 
 Andrew M. Wolfe, Asst. U.S. Atty., San Francisco, Cal., for defendants-appellants.
 Alanna G. Cline, Law Offices of Alanna G. Cline, Brighton, Mass., Michael F. Ram, Rasch-Chabot & Ram, San Francisco, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before SKOPIL, PREGERSON and BEEZER, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 Barry H. Roth, M.D. brought suit against the United States, the Veterans Administration (VA), and three of his former supervisors, Charles I. Kaufman, M.D., Peter Banys, M.D., and Nick Kanas, M.D., alleging that they deprived him of his job as Chief of the Alcohol Inpatient Unit (AIU) at the VA in violation of his first amendment rights as a "whistleblower," his fifth amendment property rights, and his fifth amendment liberty rights. Roth sued the supervisors in their individual capacities under the cause of action recognized in Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In Bivens, the Supreme Court held that an individual can sue federal officials acting under color of authority who have violated the individual's constitutional rights. Id. at 389, 91 S.Ct. at 2001.
 
 
 2
 The supervisors brought three motions before the district court: (1) a motion to dismiss the three Bivens constitutional tort claims for failure to state a claim; (2) a motion for judgment on the pleadings as to the three Bivens claims; and (3) a motion for summary judgment on those three claims on the ground that the supervisors were entitled to qualified immunity. The district court denied all three motions. On appeal, we consider only whether the district court erred in denying defendants' third motion--their motion for summary judgment on the issue of qualified immunity.[1] We affirm the district court's rulings regarding qualified immunity as to the first amendment "whistleblower" claim and the fifth amendment property claim, but reverse as to the fifth amendment liberty claim.
 
 FACTS
 
 3
 On August 15, 1984, defendant Kaufman wrote to Roth offering him the position of Chief of the Alcohol Inpatient Unit (AIU) at the Veterans Administration Medical Center in San Francisco (VA), for a period of at least thirteen months. Roth accepted the offer by letter dated August 20, 1984. Roth was hired as a "troubleshooter," and his responsibilities included overseeing and supervising all aspects of patient care in the AIU and implementing whatever policies or changes were necessary to redress a variety of serious problems plaguing the AIU at the VA. These problems included delivery of primary care to patients by nonphysicians; poor reputation in the medical community arising from a 1977 "60 Minutes" television program, which revealed that the VA's alleged "inpatient program" actually had no inpatients; isolation of the AIU from other medical and service units of the VA; erratic, nonmedical standards for patient admission and care; and conflict between the nursing staff and psychiatrists.
 
 
 4
 The defendants warned Roth during employment negotiations that he would face substantial difficulties in attacking these problems, and they instructed Roth to undertake necessary steps to fulfill his duties. Roth did so. He altered staffing responsibilities, staff/patient ratios, personnel, and admission criteria for patients. He also improved the treatment of patients and facilitated their movement through the program.
 
 
 5
 In the process of devising and implementing these changes, Roth repeatedly reported wastefulness, mismanagement, unethical conduct, violations of regulations, and incompetence to his superiors and to administrative personnel. Roth's criticisms apparently provoked some hostility and resistance from existing staff and administrative personnel. Defendants had predicted this outcome and promised to support Roth. Roth alleges that, rather than provide the promised support, defendants undermined Roth's attempt to exercise his job responsibilities.
 
 
 6
 On March 18, 1985, allegedly in response to Roth's "whistleblowing," defendant Kaufman removed Roth as Chief of AIU, demoting him to the position of staff psychiatrist. Kaufman also informed Roth at that time that he planned to terminate Roth's employment by July 1, 1985. Consequently, Roth left active duty on June 15, 1985, but remained an employee on part-time/leave status from July 1 to August 31, 1985.
 
 SCOPE OF APPELLATE REVIEW
 
 7
 We can review an appeal only of a final judgment. 28 U.S.C. Sec. 1291 (1982). A district court's order denying a motion for summary judgment or a motion to dismiss is thus ordinarily not reviewable. See Simons v. United States, 497 F.2d 1046, 1050 (9th Cir.1974). The final judgment rule does not apply, however, to certain collateral orders. Velasquez v. Senko, 813 F.2d 1509, 1511 (9th Cir.1987) (citing Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). The Supreme Court has held that an order denying a motion for summary judgment on the issue of qualified immunity may, under certain circumstances, constitute an appealable collateral order. Mitchell v. Forsyth, 472 U.S. 511, 528, 530, 105 S.Ct. 2806, 2817, 2818, 86 L.Ed.2d 411 (1985). The only appealable issue "is a purely legal one: whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law." Id. at 528 n. 9, 105 S.Ct. at 2816-2817 n. 9. It is within this framework that we review the claim raised by the defendants that the district court improperly denied their motion for summary judgment because they are entitled to qualified immunity.
 
 DISCUSSION
 
 8
 Defendants contend they are entitled to qualified immunity on each of Roth's three Bivens claims, i.e. that defendants violated Roth's first amendment rights as a whistleblower, his fifth amendment property interest in his VA job, and his fifth amendment liberty interest. In Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that a federal official has qualified immunity unless s/he "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818, 102 S.Ct. at 2738. In Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court explained that this "clearly established right" must be viewed with some particularity: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 3039. The Court did not require that the specific action in question have been held illegal before the action occurred, but the Court did insist that the unlawfulness of the action be "apparent" under preexisting law. Id.
 
 
 9
 Roth's First Amendment "Whistleblower" Claim
 
 
 10
 The defendants contend that they are entitled to qualified immunity on Roth's claim that they terminated him in retaliation for his whistleblowing activities. We must decide whether the right which Roth alleges the defendants violated was clearly established at the time the defendants acted. See Velasquez, 813 F.2d at 1511.
 
 
 11
 Twenty years ago, the Supreme Court held that an individual's exercise of his or her "right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." Pickering v. Board of Educ., 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 1738, 20 L.Ed.2d 811 (1968). Roth alleges that the defendants reassigned and ultimately dismissed him from public employment because he reported wastefulness, unethical conduct, mismanagement, violation of government regulations and policies, and danger to the safety and health of VA patients in defendant's management of the VA AIU. Roth presented evidence in his affidavits that defendants instructed him not to voice these criticisms outside their ranks and that defendants censored his written reports. Defendants argue, however, that these allegations do not constitute retaliation for whistleblowing because Roth was not commenting on matters of public concern, but merely gave his opinions on matters of personal interest and office management.
 
 
 12
 Whether an employee's speech involves a matter of public concern is a question of law. Connick v. Myers, 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690-91 n. 7, 75 L.Ed.2d 708 (1983).[2] In Connick, the Supreme Court set forth the parameters for determining when speech addresses matters of public concern. The Court stated that the reviewing court must characterize the speech in question by looking at its content, form, and context in light of the entire record. Id. at 147-48, 103 S.Ct. at 1690-91.
 
 
 13
 In evaluating the content of the speech, courts have recognized certain subjects as inherently of public concern. For example, in Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Court held that a public school teacher's private comments to the school principal charging racially discriminatory policies and practices within the district were public expression warranting protection under Pickering. Id. at 412-15, 99 S.Ct. at 694-96. The Connick Court characterized Givhan's allegations of racial discrimination as "a matter inherently of public concern." Connick, 461 U.S. at 148 n. 8, 103 S.Ct. at 1690-91 n. 8; see also Rode v. Dellarciprete, 845 F.2d 1195, 1201 (3d Cir.1988) (plaintiff alleged she was a victim of retaliation resulting from racial hostility--"a matter of grave public concern").
 
 
 14
 Courts have also identified the misuse of public funds, wastefulness, and inefficiency in managing and operating government entities as matters of public concern. In Hamer v. Brown, 831 F.2d 1398 (8th Cir.1987), the plaintiff, director of the Environmental Academy at Southern-Arkansas University-Technical Branch (SAU-Tech), told a state fire prevention committee investigating SAU-Tech that the university allocated state funds improperly and indiscriminately fired people while creating documents after the fact to justify the terminations. Hamer alleged that the defendants declined to renew his employment contract in retaliation for his statements to the committee. The court concluded that "Hamer's speech related to the expenditure of public funds and the proper functioning of a state-supported entity[,] and his comments were made in response to a request by the committee which was authorized to investigate [the university]." Id. at 1401. The court, therefore, determined that "Hamer's speech involved a matter of public concern...." Id.
 
 
 15
 Similarly in Czurlanis v. Albanese, 721 F.2d 98 (3d Cir.1983), the court held that the plaintiff, a county auto mechanic, had spoken on matters of public concern when "he challenged practices of the Division of Motor Vehicles and of the County government generally that he considered inefficient, wasteful, and possibly fraudulent and, in some cases, made suggestions for correcting the problems." Id. at 104.
 
 
 16
 We do not necessarily suggest that all speech concerning public monies or government inefficiency automatically deserves protection. See Barnes v. McDowell, 848 F.2d 725 (6th Cir.1988). To aid us in ascertaining when speech of this type rises to a level of public concern, we examine the context of the speech, particularly the point of the speech. In Connick, the Supreme Court emphasized the distinction between speech that "seek[s] to bring to light actual or potential wrongdoing or breach of public trust," which warrants protection, and speech that merely reflects one employee's dissatisfaction with her employment. Connick, 461 U.S. at 148, 103 S.Ct. at 1690-1691. Connick involved a questionnaire about internal office procedures regarding transfers and office morale circulated by a deputy district attorney who objected to being transferred to another unit. Id. at 141, 103 S.Ct. at 1687. The plaintiff, Myers, had not sought to notify the public that the District Attorney's Office was remiss in performing its duty to investigate and prosecute criminal cases. Nor had she attempted to expose any possible misfeasances on the part of Connick--the District Attorney--or others. Id. at 148, 103 S.Ct. at 1690-91. In holding that the questionnaire did not concern matters of public interest, the Court emphasized that the questionnaire focused not on "evaluat[ing] the performance of the office but rather [on] gather[ing] ammunition for another round of controversy with [Myers'] superiors. These questions reflect one employee's dissatisfaction with a transfer...." Id.
 
 
 17
 By contrast, in Czurlanis, the Third Circuit pointed out that the plaintiff criticized government inefficiency and waste not as an aggrieved employee, but as a concerned citizen. Czurlanis, 721 F.2d at 104. There the plaintiff held a secure position and did not challenge any of the conditions of his employment. Id.; see also Callaway v. Hafeman, 832 F.2d 414, 417 (7th Cir.1987) ("the Connick test" requires us to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?' " (quoting Linhart v. Glatfelter, 771 F.2d 1004, 1010 (7th Cir.1985))); cf. Rode, 845 F.2d at 1202 (holding that speaker's "personal stake" in a controversy does not prevent speech on the issue from involving a matter of public concern).
 
 
 18
 Both the content and the context of Roth's speech reveal that it concerned matters of public importance, and thus deserves protection. Roth alleged that VA administrators and staff wasted resources, acted unethically, mismanaged personnel, and violated safety regulations, thereby putting patients in jeopardy. It can hardly be doubted that the efficient and ethical operation of the VA and the VA's compliance with applicable rules and regulations are inherently of interest to the public. Roth's charges clearly surpass those criticisms of government operations found worthy of protection in Czurlanis. They also stand in sharp contrast to the questionnaire circulated by the plaintiff in Connick. Unlike Myers' questions regarding office morale and transfer policy, Roth's criticisms of the VA went directly to the institution's performance of its duties.
 
 
 19
 The context of Roth's statements further supports our conclusion that Roth spoke on matters of public concern. Roth's criticisms of the VA involved no personal employment dispute. Nor were Roth's comments precipitated by adverse actions of his supervisors pertaining to his employment. In fact, it is undisputed that the defendants hired Roth specifically to act as a "troubleshooter," and thereby charged him with making just these kinds of criticisms. He spoke out, then, for the express purpose of addressing management and operational problems besetting the VA, at the wish of the defendants and for the good of the institution, the Veterans it serves, and the public.
 
 
 20
 Our conclusion that Roth's speech involved matters of public concern is bolstered by our recent decision in Schwartzman v. Valenzuela, 846 F.2d 1209 (9th Cir.1988). Schwartzman involved a factual situation closely resembling the one before us. Schwartzman was a staff psychologist at Napa State Hospital who alleged that he was "fired because he publicly criticized the hospital for unnecessarily administering psychotropic drugs, failing to provide safe work conditions, and inadequately supervising a penal code patient who raped and killed one of Schwartzman's patients." Id. at 1210. We affirmed the district court's denial of defendants' motions for summary judgment based on qualified immunity. Although the court never addressed whether Schwartzman's speech addressed a matter of public concern, it must have assumed this implicitly, since it concluded that Schwartzman's speech was protected, and that his right to speak out without fear of retaliation was clearly established at the time defendants discharged him. Id. at 1210-11.
 
 
 21
 We therefore hold that it was clearly established at the time defendants took adverse action against Roth that Roth's speech concerned matters of public importance and thus was protected.[3]
 
 
 22
 Defendants argue, however, that even if Roth's speech "touched on a matter of public concern," they could not reasonably have believed that they were violating his rights because Roth's comments disrupted the office. Pickering requires that the court balance the right of the government employee to comment on matters of public concern against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35. This balancing presents a legal question. See Zamboni v. Stamler, 847 F.2d 73, 78 (3d Cir.1988); Barnes, 847 F.2d at n. 9 (citing Rankin v. McPherson, --- U.S. ----, 107 S.Ct. 2891, 2897 n. 9, 2898-99, 97 L.Ed.2d 315 (1987); Rode, 845 F.2d at 1202.
 
 
 23
 For us to find that the government's interest as an employer in a smoothly-running office outweighs Roth's first amendment right, defendants must demonstrate actual, material and substantial disruption. See Zamboni, 847 F.2d at 79. In evaluating any alleged disruption, we must "focus[ ] on the effective functioning of the public employer's enterprise." Rankin v. McPherson, 107 S.Ct. at 2899. We also recognize that the state may have a strong interest in avoiding disruption of "work, personnel relationships, or the speaker's job performance...." Id.
 
 
 24
 In Connick, the Court explained that "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." Connick, 461 U.S. at 151-52, 103 S.Ct. at 1692-93. However, the Court stressed that the government's burden in justifying a termination depends on the nature of the employee's expression: the greater the protection afforded the whistleblower's speech, the greater the showing of disruption must be. Id. at 150, 103 S.Ct. at 1691-92. In Connick, the Court held only that "[t]he limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." Id. at 154, 103 S.Ct. at 1693-94 (emphasis added). The Connick court had held that all but one question on the questionnaire distributed by the plaintiff concerned matters only of personal interest to the plaintiff; the questionnaire otherwise did not involve matters of public concern. Id. at 148-49, 103 S.Ct. at 1690-91. Moreover, in stating that employers need not suffer office disruption and destruction of working relationships, the Court "caution[ed] that a stronger showing [of disruption] may be necessary if the employee's speech more substantially involved matters of public concern." Id. at 152, 103 S.Ct. at 1692-93.
 
 
 25
 In this case, we have held that it was clearly established at the time defendants acted that Roth's speech predominantly concerned matters of public interest. While both plaintiff and defendants concede that some hostility developed among the staff, the defendants recognized, expected, and warned Roth that these feelings might arise and cause conflict. We would expect "whistleblowing," by its very nature, to engender some hostility and resistance. As the Fifth Circuit has stated:
 
 
 26
 An employee who accurately exposes rampant corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office.
 
 
 27
 Czurlanis, 721 F.2d at 107 (quoting Porter v. Califano, 592 F.2d 770, 773-74 (5th Cir.1979)).
 
 
 28
 Moreover, Roth asserts that defendants' failure to support him in instituting necessary reforms contributed to any disruption that may have occurred. Defendants cannot rely on disruption which they instigated or exacerbated to outweigh Roth's first amendment rights. See Zamboni, 847 F.2d at 79; Czurlanis, 721 F.2d at 107. The magnitude of office disruption caused by Roth's criticisms and the extent of the defendants' role in causing the disruption are disputed factual issues which required the district court to deny defendants' motion for summary judgment.
 
 
 29
 Defendants would have us ignore the need for findings on these underlying factual issues. They contend that because we must balance competing interests in deciding whether office disruption outweighs protected speech, and because this balancing process is fact-specific, public officials cannot be expected to predict the outcome of such balancing or engage in it themselves. Defendants cite Benson v. Allphin, 786 F.2d 268 (7th Cir.), cert. denied, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986), in support of this proposition. In Benson, the Seventh Circuit recognized that allegations of constitutional violations which require courts to balance competing interests may make it difficult to find the law "clearly established" when assessing claims of qualified immunity. Id. at 276. The Seventh Circuit suggested that, in cases requiring balancing, "the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under the [sic] Harlow." Id. (footnote omitted). But Benson also acknowledged that, in certain situations, "the result of the balancing test will be a foregone conclusion...." Id. at 276 n. 18.
 
 
 30
 More importantly, this court and others have found the law to be established with sufficient clarity to deny defendants the protection of qualified immunity at the summary judgment stage, in cases comparable to Roth's. See, e.g., Schwartzman, 846 F.2d at 12; Zamboni, 847 F.2d at 79 n. 7; cf. Czurlanis, 721 F.2d at 108-09. If we accepted defendants' argument for a broader reading of Benson, we essentially would be holding that public employees can never maintain a Bivens action alleging retaliation for exercise of their first amendment rights because adjudicating these claims requires particularized balancing. We decline to adopt a rule that would effectively eviscerate whistleblower protection for public employees. Moreover, Benson is distinguishable on its procedural posture. The Seventh Circuit considered the issue of qualified immunity after a full trial, having more thoroughly developed facts for comparison to existing case law. We do not see in the record sufficient facts on defendants' claim of office disruption.
 
 
 31
 We hold that, at the time the defendants acted, case law had clearly established that Roth's criticisms regarding wastefulness, ethical and statutory violations, and risk to the patients and public were protected speech relating to matters of public concern. Because there are underlying factual issues regarding the extent of office disruption, we hold that the district court properly denied defendants' motion for summary judgment on Roth's first amendment claim. See Zamboni, 847 F.2d at 79.
 
 Roth's Fifth Amendment Property Claim
 
 32
 Defendants argue that they are entitled to qualified immunity on Roth's claim that they violated his fifth amendment property rights in depriving him of his VA job without due process. Once again, our review is limited to determining whether defendants' actions as alleged by Roth violated a clearly established fifth amendment property right. Velasquez, 813 F.2d at 1511.
 
 
 33
 Before we decide if Roth had a property interest in his job entitling him to due process under the fifth amendment, we must find that the defendants deprived him of his job. There is a substantial and material issue of fact on this question. Roth contends that he first was demoted from his position as Chief of the AIU to staff psychiatrist and then was discharged. Roth concedes that he made arrangements for other employment, but insists that he left involuntarily after being told by defendant Kaufman to be gone by July 1, several months prior to the minimum 13-month duration of his employment.[4] Defendants, on the other hand, deny terminating Roth; they insist that he quit voluntarily. For us to determine whether Roth was fired or quit and the nature and extent of his demotion requires resolution of several disputed factual issues, a task we cannot undertake on appeal. For this reason, we find that the district court properly denied defendants' motion for summary judgment based on qualified immunity on Roth's claim of deprivation of property under the fifth amendment.
 
 
 34
 Moreover, even if we could find that defendants deprived Roth of his job, disputed factual issues would preclude us from determining if Roth had a clearly established property right in retaining his position. It has been well-settled for over fifteen years that an individual may have a property interest in government employment protected by the fifth amendment. See Board of Regents v. Roth, 408 U.S. 564, 577-78, 92 S.Ct. 2701, 2709-10, 33 L.Ed.2d 548 (1972). To have a property interest in government employment, the employee must demonstrate an entitlement to the job. Entitlements arise from " 'rules or understandings' from independent sources, such as statutes, regulations, and ordinances, or express or implied contracts." Orloff v. Cleland, 708 F.2d 372, 377 (9th Cir.1983) (quoting Roth, 408 U.S. at 577, 92 S.Ct. at 2709). To find an entitlement to a job based on an "understanding," the understanding must be "mutually explicit." Id. Whether such an understanding exists will frequently turn on factual questions, see id., which we cannot decide here.
 
 
 35
 It is unclear whether Roth has a protectable property interest arising from statute. If Roth was a permanent,[5] non-probationary VA employee, he was clearly entitled to procedural protections before being deprived of his job. See, e.g., 38 U.S.C. Sec. 4110 (1982 & Supp.III 1985). The defendants would be presumed to know these rights, see Merritt v. Mackey, 827 F.2d 1368, 1373 (9th Cir.1987), and consequently would not be shielded by qualified immunity. It is not clear, however, that Roth was a non-probationary employee, since physicians appointed to permanent positions within the VA pursuant to 38 U.S.C. Sec. 4106 serve a two-year probationary period. 38 U.S.C. Sec. 4106(b) (1982). Roth argues that he should have received credit for prior service.
 
 
 36
 We need not resolve this question. Regardless of whether Roth was a non-probationary employee protected by statute, the Supreme Court had already established that, even as a probationary employee, Roth could still have a property interest in his job if he had an expectation of continued employment. See Roth, 408 U.S. at 577, 92 S.Ct. at 2709 (citing Connell v. Higginbotham, 403 U.S. 207, 208, 91 S.Ct. 1772, 1773, 29 L.Ed.2d 418 (1971) (holding that teacher without tenure or formal contract enjoyed due process rights)); cf. Orloff, 708 F.2d at 377 (remanding to district court for findings on existence of mutually explicit understanding that part-time physician had expectation of continued employment). Roth alleges that his prior experience working at the VA, his special pay agreement, and discussions with his supervisor all created an implied promise of continued employment. See Orloff, 708 F.2d at 377 (prior treatment of plaintiffs and other VA employees may give rise to mutual understanding sufficient to constitute a de facto property interest). If there was such an understanding, Roth had a clearly established right to retain his job pursuant to that understanding, unless the defendants provided him with due process. Because Roth has raised a genuine and material issue of fact as to the existence of this agreement, the district court did not err in denying the motion for summary judgment on the issue of qualified immunity. Id.
 
 
 37
 An additional argument raised by defendant is one we cannot review on appeal. The defendants argue that they are entitled to qualified immunity on Roth's fifth amendment deprivation of property claim because he did not approach them about grieving his demotion or termination, and because they were not responsible for providing him with any due process to which he may have been entitled. Roth alleges that he sought reconsideration of the decision to terminate him and was told he had no access to grievance procedures.
 
 
 38
 In Velasquez, 813 F.2d 1509, we considered an analogous situation. There the plaintiffs brought Bivens actions against federal immigration officials alleging that the officials violated the plaintiffs' constitutional rights by conducting raids on the plaintiffs' neighborhoods and businesses without probable cause or a warrant. The defendants moved for summary judgment on the qualified immunity issue because "they were not present" during the raids in question. Id. at 1511. We held that this issue was not appealable because it did not present a purely legal question. Id. The Velasquez defendants "present[ed] a disputed factual issue, inextricably bound up in the underlying claim: whether the defendants were present at the raids and the extent to which they participated in or directed the operations." Id. In this case, Roth and the defendants dispute the defendants' role in denying Roth his right to notice, hearing or other due process protection upon demotion or termination. Because this defense does not involve the purely legal question of whether the rights which Roth alleges defendants violated were clearly established, we cannot review this issue.
 
 Roth's Fifth Amendment Liberty Claim
 
 39
 The defendants argue that the district court erred in denying their motion for summary judgment on the qualified immunity issue with respect to Roth's claim that they deprived him of his liberty without due process in violation of the fifth amendment. Again, we must determine if Roth had a clearly established liberty interest which defendants violated at the time they acted. See Velasquez, 813 F.2d at 1511.
 
 
 40
 It is well-settled that an individual may have a liberty interest in employment protected by the fifth amendment due process clause. See, e.g., Roth, 408 U.S. at 572-73, 92 S.Ct. at 2706-07; Merritt v. Mackey, 827 F.2d at 1373 (quoting Bollow v. Federal Reserve Bank, 650 F.2d 1093, 1100 (9th Cir.1981), cert. denied, 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982)). To establish such a liberty interest, the individual must show both a tangible loss and a " 'charge [made by the government] against him that might seriously damage his standing and associations in his community.' " Stretten v. Wadsworth Veterans Hosp., 537 F.2d 361, 365 (9th Cir.1976) (quoting Roth, 408 U.S. at 573, 92 S.Ct. at 2707). The issue in this case is whether Roth's allegations and affidavits set forth a clearly established right, allegedly violated by the defendants, with respect to the second requirement.[6]
 
 
 41
 At the time defendants acted, the Supreme Court had already declared that an individual had a protectable liberty interest when his or her " 'good name, reputation, honor, or integrity' is at stake.' " Roth, 408 U.S. at 573, 92 S.Ct. at 2707 (quoting Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971)), or when the government action stigmatizes the individual, effectively "foreclos[ing] his freedom to take advantage of other employment opportunities." Id. Clearly accusations of "dishonesty or immorality would implicate an individual's liberty interest." Stretten, 537 F.2d at 365. To decide less clear-cut cases and delineate the scope of the liberty interest, we look to the "nature of the charge used as a grounds for termination and not the actual consequences of the charge." Id.
 
 
 42
 In applying this standard in Stretten, we held that allegations of incompetence or inability to get along with coworkers did not infringe a liberty interest, even though they might negatively influence the individual's professional life by "forc[ing] the individual down one or more notches in the professional hierarchy." Id. at 366 (footnote omitted). We distinguished between matters within the scope of the employer-employee relationship that could lead to "reduced economic returns and diminished prestige" and those that might result in "permanent exclusion from, or protracted interruption of, gainful employment within the trade or profession." Id. The latter might warrant procedural protection under the Constitution, but the former does not. In Stretten, the defendants had charged the plaintiff with "inability to perform satisfactorily as a pathology resident, including an unwillingness or inability to deal with his coworkers in a professional manner." Id. Stretten was a pathology resident terminated from a residency program at the VA hospital in Los Angeles. We found that the charges leveled at him were unlikely to prevent Stretten from practicing medicine or pathology, and we noted that he had, in fact, obtained a pathology residency elsewhere. Id.
 
 
 43
 Based on the facts and holding of Stretten alone, the defendants here reasonably could have believed they were not violating any clearly established liberty interest of Roth's. Roth's complaint alleged that defendants damaged his reputation and caused him to lose "professional momentum, career development, professional opportunities, and good standing in the psychiatric/medical communities." Roth has set forth no facts in the complaint or in the affidavits indicating that the defendants stigmatized him to the extent of foreclosing his opportunity to practice his chosen profession. Roth makes only vague allegations that defendants suggested to other potential employers that Roth had difficulty getting along with others and would not make a good manager. Moreover, it is undisputed that Roth did, in fact, secure another position as a psychiatrist in Boston. Because the defendants' actions did not violate a clearly established liberty interest at the time they acted, we hold that the district court erred in denying summary judgment on Roth's fifth amendment liberty interest claim. The defendants were entitled to qualified immunity on this claim.
 
 CONCLUSION
 
 44
 We conclude that the district court properly denied the defendants' motion for summary judgment based on qualified immunity on Roth's first amendment claim. Roth had a clearly established right to speak on matters of public concern without fear of retaliation, and there are genuine issues of fact regarding the extent of office disruption caused by Roth's whistleblowing which preclude a grant of summary judgment.
 
 
 45
 We affirm the district court's denial of summary judgment on Roth's fifth amendment property claim as well. Genuine issues of fact exist as to whether Roth was fired or quit and whether he had an expectation of continued employment.
 
 
 46
 We conclude, however, that the district court erred in denying defendants' motion for summary judgment as to Roth's liberty interest claim. Since Roth has not alleged facts showing that defendants' actions stigmatized him, he had no clearly established liberty interest under the fifth amendment.
 
 
 47
 We award costs to the plaintiff, Barry H. Roth, M.D.
 
 
 48
 We AFFIRM IN PART and REVERSE IN PART.
 
 
 
 [1]
 The district court's denial of defendants' first two motions, i.e., their motion to dismiss for failure to state a claim and their motion for judgment on the pleadings, is not a final judgment and therefore is not reviewable on appeal. 28 U.S.C. Sec. 1291 (1982); Simons v. United States, 497 F.2d 1046, 1050 (9th Cir.1974)
 
 
 [2]
 Were it a question of fact, we would have to affirm without deciding this question because our review is limited to the purely legal question of whether the law rendering defendants' conduct illegal was clearly established at the time the defendants acted
 
 
 [3]
 Defendants contend that the Seventh Circuit's recent decision in Zaky v. United States Veterans Admin., 793 F.2d 832 (7th Cir.), cert. denied, 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986), precludes this result. Zaky, like the instant case, involved a whistleblowing claim by a terminated VA physician. Zaky had written a memorandum critiquing certain hospital procedures. The Seventh Circuit held that statements regarding patient care were not inherently a matter of public concern, and that Zaky's comments did not involve matters of public interest. Zaky's remarks addressed internal hospital procedures and were made in the context of an ongoing employment dispute about Zaky's competency. Zaky issued his criticisms two days after a superior reprimanded him for abandoning a patient. The case here is substantially different. Roth's allegations were broader and more far reaching than Zaky's and, most significantly, did not arise from a personal employment dispute. Rather, defendants hired Roth to do precisely what he did
 
 
 [4]
 Roth contends that he had an expectation of continued employment of two to four years
 
 
 [5]
 We reject defendants' contention that Roth was only a temporary employee. It is undisputed that the defendants hired Roth for at least thirteen months. According to the VA regulations governing the hiring of medical personnel, an employee cannot be considered "temporary" if he or she is hired for more than ninety days, unless the Chief Medical Officer finds it impracticable to obtain the required services through permanent appointments made under 38 U.S.C. Sec. 4104 (Supp.III 1985). 38 U.S.C. Sec. 411(a)(3)(A) (Supp.III 1985). The defendants have not presented evidence of any such findings
 
 
 [6]
 An issue also exists regarding whether Roth suffered the requisite tangible loss. See Board of Regents v. Roth, 408 U.S. at 573, 92 S.Ct. at 2707. As we pointed out in our discussion of Roth's fifth amendment property interest, Roth and defendants dispute whether he was fired or quit and the nature and extent of the demotion to staff psychiatrist. We may not resolve these disputed factual issues. Were these the only issues, we would therefore affirm the district court's denial of summary judgment. However, as we will show, Roth's failure to allege or raise a genuine issue of fact regarding stigmatization sufficient to create a liberty interest leads us to reach the opposite result. Defendants reasonably could have believed that they were not violating a clearly established liberty interest of Roth's because the adverse employment actions taken by defendants did not stigmatize him. Stretten, 537 F.2d at 365