Richard CEBALLOS, Plaintiff–Appellant,

v.

Gil GARCETTI; Frank Sundstedt; Carol Najera; County of Los Angeles, Defendants–Appellees.

No. 02–55418.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 2, 2003.

Filed March 22, 2004.

Humberto Guizar and Luis Carillo, Montebello, CA, for the Plaintiff–Appellant.

Cindy S. Lee and Adrian Barrio, Glendale, CA, for the Defendants–Appellees.

Before: REINHARDT, O'SCANNLAIN, and FISHER, Circuit Judges.

REINHARDT, Circuit Judge:

Richard Ceballos filed this action pursuant to 42 U.S.C. § 1983 contending that he was subjected to adverse employment actions by his supervisors at the Los Angeles County District Attorney's Office in retaliation for engaging in speech protected by the First Amendment. He also asserts that the county fails to train, supervise, and discipline its district attorneys regarding such unlawful retaliation.

The district court granted a motion for summary judgment in favor of the individual defendants—the District Attorney (in his individual capacity), the then-Head Deputy District Attorney, and Ceballos's immediate supervisor—on the basis of qualified immunity, and granted a separate motion for summary adjudication in favor of the county defendants—the county and the District Attorney (in his official capacity)—on the basis of Eleventh Amendment immunity. Given that the disputed facts must be resolved in Ceballos's favor and that all inferences that may reasonably be drawn must also be drawn in his favor, we reverse the district court's rulings. We hold that, for purposes of summary judgment, qualified immunity was not available to the individual defendants because the law was clearly established that Ceballos's speech addressed a matter of public concern and that his interest in the speech outweighed the public employer's interest in avoiding inefficiency and disruption. Because the Eleventh Amendment does not apply to political subdivisions of the state, the county could ordinarily not assert sovereign immunity, although in this case it could do so if such immunity applied to the District Attorney. Whether the District Attorney, when acting in his official capacity, is entitled to such immunity depends on whether he was performing a state or a county function when he took the alleged actions with respect to Ceballos. We hold that in most respects he was acting in the latter capacity. Thus, he is not entitled to Eleventh Amendment immunity, and neither is the County.

## BACKGROUND

Ceballos has been a deputy district attorney since 1989. In 1997 or 1998 he was assigned to the District Attorney's Office's Pomona Branch and about a year later was promoted to calendar deputy, with supervisory responsibilities over two to three deputy district attorneys. In late February 2000, a defense attorney in *People v.*

*Cusky,* a case then being prosecuted by the District Attorney's Office, told Ceballos that he believed that one of the arresting deputy sheriffs may have lied in a search warrant affidavit. He asked Ceballos to investigate. Ceballos was supervising the deputy district attorney assigned to the case, but he decided to investigate the allegations himself. After reviewing the relevant documents in the case and visiting the crime scene, Ceballos determined that the affidavit of the deputy sheriff had, at the least, grossly misrepresented the facts.

Ceballos discussed the problems arising from this investigation with others in the Office, including his immediate supervisor, Carol Najera and the then-Head Deputy District Attorney, Frank Sundstedt. Everyone agreed that the validity of the warrant was questionable. On March 2, 2000, Ceballos sent Sundstedt a memorandum discussing his determination that the affidavit was falsified and recommending that the case be dismissed. Sundstedt instructed Ceballos to revise the memorandum to make it less accusatory of the deputy sheriff. Ceballos rewrote the memorandum, and a meeting was held on March 9 with representatives from the Sheriff's Department, Sundstedt, Najera, Ceballos, and another deputy district attorney.

Following the meeting with the Sheriff's Department, Sundstedt was not certain that *Cusky* should be dismissed and decided to proceed with the case pending the outcome of a motion challenging the search warrant, which had already been filed by the defense.[1] Ceballos informed defense counsel that he believed the affidavit contained false statements, and defense counsel subpoenaed him to testify at the hearing. Ceballos told Najera that pursuant to

*Brady v. Maryland* and other case law, he was obligated to turn over to the defense the memoranda he had prepared regarding his opinion of the legality of the search warrant. Ceballos contends that Najera instructed him to edit the memorandum to include statements by only one detective and to limit his in-court testimony. When Ceballos testified at the hearing on the motion, the *Cusky* court sustained the prosecution's objections to several questions defense counsel asked him. Ceballos maintains that, as a result, he was unable to tell the court certain of his conclusions (and the reasons therefor) regarding the accuracy of the warrant. The defendant's motion was denied, and the prosecution proceeded. Having testified for the defense, Ceballos was removed from the *Cusky* prosecution team.

Ceballos alleges that Garcetti, Sundstedt, and Najera retaliated against him for submitting the memorandum regarding the *Cusky* warrant, for otherwise reporting to or discussing with other persons the allegations of misconduct by the deputy sheriff, and for testifying truthfully at the court hearing. He alleges that the defendants took a number of retaliatory actions against him: (1) they demoted him from his position of calendar deputy to that of trial deputy; (2) Najera "threatened" him when he told her that he would testify truthfully at the hearing; (3) at the hearing itself Najera was "rude and hostile" to him; (4) Sundstedt "gave [him] the silent treatment"; (5) Najera informed him that he could either transfer to the El Monte Branch, or, if he wanted to remain in the Pomona Branch, he would be re-assigned to filing misdemeanors, a position usually assigned to junior deputy district attorneys;[2] (6) the one murder case he was

---

1. The motion asserted that there was a statement or omission in the warrant that was made deliberately or in reckless disregard of the truth, and that had the judge approving

the warrant known the truth regarding the statement, he would not have issued it.

2. The transfer to the El Monte Branch is described by Ceballos as an act of "Freeway

handling at the time was reassigned to a deputy district attorney with no experience trying murder cases;[3] (7) he was barred from handling any further murder cases; and (8) he was denied a promotion.

Ceballos filed a complaint in the district court pursuant to § 1983 against Najera, Sundstedt, and then-District Attorney Gil Garcetti in their individual capacities, as well as against Garcetti in his official capacity and the County of Los Angeles. He sought lost wages and other compensatory damages as well as injunctive relief. The county defendants moved for summary adjudication, which the district court granted on the ground that the Eleventh Amendment barred the action. Ceballos amended his complaint, and the individual defendants moved for summary judgment, which was granted on the ground that they were protected by qualified immunity. The district court declined to exercise jurisdiction over Ceballos's state law claim for intentional infliction of emotional distress. Ceballos appeals.

## ANALYSIS

## I. Individual Defendants and Qualified Immunity

■ Ceballos argues that the district court erred in holding that the individual defendants were entitled to qualified immunity. Public officials are entitled to qualified immunity for acts that do not violate "clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Rivero v. City & County of San Francisco,* 316 F.3d 857, 863 (9th Cir.2002). When considering a defendant's motion for summary judgment on the ground of qualified immunity, we must first determine whether, when the facts are taken in the light most favorable to the plaintiff and the inferences are drawn in his favor as well, these facts and inferences establish that the official's conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If so, we must next consider whether the right was clearly established at the time of the alleged improper act. *Id.* If the right was clearly established, we ask finally whether despite this fact, the official's unconstitutional conduct constituted a reasonable mistake of fact or law. *Id.* at 199, 121 S.Ct. 2151. Then, unless the constitutional error is excused on that ground, summary judgment must be denied.

## A. Ceballos's Speech Was Protected By the First Amendment

Ceballos contends that he exercised his First Amendment right to free speech in alleging that a deputy sheriff included false statements in the *Cusky* search warrant affidavit. The parties appear to dispute to whom Ceballos spoke about the alleged misconduct. Ceballos asserts that he told Sundstedt and Najera, other persons in the District Attorney's Office, Sheriff's Department personnel, the *Cusky* judge, and defense counsel about the untruthful affidavit. The defendants state that Ceballos "sent the memorandum to one person, Sundstedt," the Head Deputy District Attorney, but do not expressly dispute Ceballos's assertion that he spoke to the others as well. It is unclear whether the defendants contend that Ceballos's memorandum is all that is relevant here or that the other speech to which Ceballos refers did not occur. For the reasons set

---

Therapy," a practice of punishing deputy district attorneys by assigning them to a branch requiring a long commute to work.

**3.** Ceballos asserts that denying him the opportunity to prosecute the murder case adversely affected his opportunities for promotion.

forth below, we hold that, for purposes of summary judgment, Ceballos's allegations of wrongdoing in the memorandum constitute protected speech under the First Amendment; accordingly, we need not determine here whether similar protection should be afforded to his other communications. Those matters are best explored at trial.

█ Although public employees do not relinquish their right to free speech by virtue of their employment, neither do they enjoy absolute First Amendment rights. *Waters v. Churchill*, 511 U.S. 661, 671–74, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977–78 (9th Cir.1998). To determine whether Ceballos's speech is protected by the First Amendment, we apply a two-step test that stems from the Supreme Court's holdings in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968):(1) we ask whether the speech addresses a matter of public concern, and, if it does, (2) we engage in an inquiry, commonly known as the *Pickering* balancing test, to determine whether Ceballos's interest in expressing himself outweighs the government's interests "in promoting workplace efficiency and avoiding workplace disruption." *Rivero*, 316 F.3d at 865 (quoting *Hufford v. McEnaney*, 249 F.3d 1142, 1148 (9th Cir.2001)).

### 1. Matter of Public Concern [4]

█ Whether a public employee's speech addresses a matter of public concern is a question of law. *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. 1684. This determination is made in light of "the content, form, and context" of the speech.

*Coszalter v. City of Salem*, 320 F.3d 968, 973–74 (9th Cir.2003) (internal quotation marks omitted). Content is "the greatest single factor in the *Connick* inquiry." *Johnson v. Multnomah County*, 48 F.3d 420, 424 (9th Cir.1995) (quoting *Havekost v. United States Dep't of the Navy*, 925 F.2d 316, 318 (9th Cir.1991)).

█ A public employee addresses a matter of public concern when his speech relates to an issue of " 'political, social, or other concern to the community.' " *Brewster*, 149 F.3d at 978 (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. 1684); *see also Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir.1995). "Speech that concerns issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government merits the highest degree of first amendment protection." *Coszalter*, 320 F.3d at 973 (internal quotation marks omitted). In contrast, "speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies, is generally not of public concern." *Id.*

In defining the scope of First Amendment protection accorded to public employees' speech, the Supreme Court has distinguished between speech "as a citizen upon matters of public concern" at one end and speech "as an employee upon matters only of personal interest" at the other. *Connick*, 461 U.S. at 147, 103 S.Ct. 1684. *Connick* dealt with an assistant district attorney's allegations that her supervisors retaliated against her for distributing a questionnaire to her colleagues. The Supreme Court held that when the assistant district attorney solicited her colleagues'

---

**4.** We are concerned here only with on-the-job, work-related speech. *Cf. Roe v. City of San Diego*, 356 F.3d 1108 (9th Cir.2004) (addressing the public concern test in the context of a public employee's off-duty, non-work-related speech).

views on office morale, the policy for transferring employees, the need for a grievance committee, and the level of confidence in supervisors, her speech was not protected by the First Amendment because these questions were intended primarily to "gather ammunition for another round of controversy" in the employee's individual personnel dispute. *Id.* at 148, 103 S.Ct. 1684. In contrast, when the assistant district attorney asked her colleagues whether they felt pressured to work in political campaigns, her speech *was* a matter of public concern under the First Amendment because "the issue of whether assistant district attorneys are pressured to work in political campaigns is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." *Id.* at 149.

■ What is critical under *Connick*, as we explained in *Roth v. Veteran's Admin. of United States,* is the "point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" 856 F.2d 1401, 1406 (9th Cir. 1988). Thus, "[i]t is only 'when it is clear that ... the information would be of *no* relevance to the public's evaluation of the performance of governmental agencies' that speech of government employees receives no protection under the First Amendment." *Ulrich v. City & County of San Francisco,* 308 F.3d 968, 978 (9th Cir.2002) (quoting *Pool v. Vanrheen,* 297 F.3d 899, 907 (9th Cir.2002)).

The individual defendants concede that Ceballos's allegations that an arresting deputy sheriff may have lied in a search warrant affidavit constitutes whistleblowing. We have held that when government employees speak about corruption, wrongdoing, misconduct, wastefulness, or ineffi-

ciency by other government employees, including law enforcement officers, their speech is inherently a matter of public concern. *See, e.g., Blair v. City of Pomona,* 223 F.3d 1074, 1079 (9th Cir.2000); *Johnson,* 48 F.3d at 425. The defendants do not argue that Ceballos's First Amendment interest is diminished because his purpose was primarily to further a personal personnel dispute. Instead, they contend that Ceballos's allegations of law enforcement perjury should not be protected because he included them in a memorandum to his supervisors that he prepared in fulfillment of an employment responsibility.

Under *Connick,* speech that is protected by virtue of its content does not lose that protection simply because the speech is directed to other employees of that governmental employer rather than to members of the public. 461 U.S. at 147–49, 103 S.Ct. 1684. In particular, we have repeatedly held that speech exposing official wrongdoing is no less deserving of First Amendment protection because the public employee reported the misconduct to his supervisors rather than to the news media. *See, e.g., Hufford,* 249 F.3d at 1150 ("It would be absurd to extend First Amendment protection only to those whistle-blowers who immediately appear on the local news."); *Ulrich,* 308 F.3d at 979 ("[T]he public employee does not forfeit his protection against governmental retaliation because he chose to press his cause internally."); *Keyser v. Sacramento City Unified Sch. District,* 265 F.3d 741, 747 (9th Cir. 2001) (holding that employees did not forgo First Amendment protection when they met with the School District's board for the purpose of charging that their supervisor's evaluation practices violated District policy and that he was misusing federal funds).

Nor do our cases provide any support for the defendants' contention that a public

employee's speech is deprived of First Amendment protection whenever those views are expressed, to government workers or others, pursuant to an employment responsibility. In *Roth*, the plaintiff was fired from his position as "trouble shooter" at the Veterans Administration after he exposed corruption, mismanagement, and other problems in written reports that were prepared as part of his job responsibilities. 856 F.2d at 1406. Concluding that Roth's comments were not to further personal grievances, but rather "for the express purpose of addressing ... problems besetting the VA, at the wish of the defendants and for the good of the institution, the Veterans it serves, and the public," we held that Roth could not be denied First Amendment protection simply because his efforts to expose wrongdoing were included in reports written pursuant to his employment duties. *Id.*

In other cases we have similarly found public employees' speech to be a matter of public concern even though it was made in furtherance of an employment responsibility. In *Nunez v. Davis*, 169 F.3d 1222, 1226 (9th Cir.1999), a judge directed the court administrator to assign only those clerks who had worked on his reelection campaign to attend training sessions. In protest of the policy, the administrator arranged for two clerks who did not campaign for the judge to attend the sessions. *Id.* We held that this act of protest constituted symbolic speech on a matter of public concern. *Id.* at 1228; *see also Pool*, 297 F.3d at 907–08 (holding that an employee whose job duties included addressing diversity and acting as a liaison to the African American and Latino communities spoke on matters of public concern when she spoke about issues of racial and ethnic diversity in the sheriff's office).

Although our cases are clear, our specially concurring colleague contends that we should revisit en banc our holdings in *Roth* and its progeny and establish a per se rule that public employees are not protected by the First Amendment when their speech is uttered in the course of carrying out their employment obligations. We disagree. The right of public employees to speak freely on matters of public concern is important to the orderly functioning of the democratic process, because public employees, by virtue of their access to information and experience regarding the operations, conduct, and policies of government agencies and officials,"are positioned uniquely to contribute to the debate on matters of public concern." *Weeks v. Bayer*, 246 F.3d 1231, 1235 (9th Cir.2001) (quoting *Gilbrook v. City of Westminster*, 177 F.3d 839, 870 (9th Cir.1999)). Stripping them of that right when they report wrongdoing or other significant matters to their supervisors would seriously undermine our ability to maintain the integrity of our governmental operations.[5]

---

5. Our colleague tries to justify his proposed rule by explaining that public employees do not have a personal interest in speech relating to their employment duties "other than in doing [their] job well." *Post* at 1189. This proposition is significant, he argues, because the underlying premise of the First Amendment is to protect against infringements upon "individuals' freedom of choice to express *their personal* opinion or otherwise to express *themselves.*" *Post* at 1189 (emphasis in the original). While we agree that the First Amendment facilitates individual autonomy, its protections do not turn upon whether a citizen has a personal interest in a particular expressive activity. Indeed, under *Connick*, personnel grievances, which are often highly personal, do not receive protection at all. As we reiterated above, free speech is essential to an effective democratic process as an institutional matter; we do not value it simply because of the right of individuals to speak on subjects of personal interest. Lest we forget, however, many public servants *do* have a personal stake in ensuring that events surrounding their employment comport with the public interest. Government employees have often

The proposed per se rule would be particularly detrimental to whistle-blowers, such as Ceballos, who report official misconduct up the chain of command, because all public employees have a duty to notify their supervisors about any wrongful conduct of which they become aware. To deprive public employees of constitutional protection when they fulfill this employment obligation, while affording them protection if they bypass their supervisors and take their tales, for profit or otherwise, directly to a scandal sheet or to an internet political smut purveyor defies sound reason.

Moreover, such a per se rule would violate the principles established by *Connick.* Subject to the *Pickering* balancing test, First Amendment protections are available to public employees who suffer retaliation for whistleblowing, regardless of whether the act of whistleblowing consists of informing higher level public officials, Congressional committees, or the media. The Supreme Court in *Connick* made no distinction between internal and external whistleblowing when it noted that speech that is "of public import in evaluating the performance of the District Attorney" may include efforts by an employee "to bring to light actual or potential wrongdoing or breach of public trust." *Connick,* 461 U.S. at 148, 103 S.Ct. 1684.[6]

Other circuits have also rejected any per se rule that a public employee does not receive any First Amendment protection for speech that occurs within the scope of his employment duties. *See, e.g., Lewis v. Cowen,* 165 F.3d 154, 161–64 (2d Cir.1999) (holding that a public employee did not forgo First Amendment protection when he refused to present proposed policy changes in a positive light to the Connecticut Gaming Policy Board); *Baldassare v. New Jersey,* 250 F.3d 188, 197 (3d Cir. 2001) (holding that an internal investigator's statement about other employees' alleged criminal actions "falls squarely within the core public speech delineated in *Connick* " even though his job duties included exposing wrongdoing); *Kennedy v. Tangipahoa Parish Library Bd. of Control,* 224 F.3d 359, 367–376 (5th Cir.2000) (refusing to deny First Amendment protection to a library branch manager who wrote a letter to her supervisors suggesting security measures to be taken at library branches); *Rodgers v. Banks,* 344 F.3d 587, 597–602 (6th Cir.2003) (refusing to deny protection to a director of quality management who sent a memorandum stating that the reconfiguration of a patient area would have an adverse effect on patient care); *Taylor v. Keith,* 338 F.3d 639, 643–46 (6th Cir.2003) (holding that police reports raising allegations of brutali-

---

sacrificed far more remunerative opportunities in other sectors in response to compelling public needs, such as the inspirational call of our President in 1961:"Ask not what your country can do for you—ask what you can do for your country." For such employees, promoting the public good is a deeply personal mission that is at least as important as personal career advancement.

**6.** The special concurrence further expresses doubts that Ceballos has a "cognizable First Amendment interest" because as a prosecutor, his statements must be attributed to the government, which"has no First Amendment

rights." *Post* at 1189–90. However, a public employee who seeks to expose corruption by reporting his concerns to his supervisor is not acting as a spokesperson for the government when he makes his report. We need not consider here under what circumstances a prosecutor assigned to prosecute a corruption case is speaking for the government when he publicly discusses the corrupt practices involved. Thus, contrary to our concurring colleague's belief, there is no conflict between our decision in *Roth,* 856 F.2d 1401, and its progeny, on one hand, and *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), and its progeny, on the other.

ty against fellow officer touched upon a matter of public concern); *Delgado v. Jones,* 282 F.3d 511, 519 (7th Cir.2002) (refusing to deny protection to an officer's allegations of criminal activities involving a relative of an elected official simply because he included them in a memorandum to his supervisors); *Dill v. City of Edmond,* 155 F.3d 1193, 1202–03 (10th Cir. 1998) (holding that an officer's statements and reports to his supervisors regarding his belief that exculpatory evidence existed and was being withheld in a murder case involved a matter of public concern); *Fikes v. City of Daphne,* 79 F.3d 1079, 1084 (11th Cir.1996) (holding that a police officer's report of misconduct by fellow officers in a high-speed chase addressed a matter of public concern).[7]

To the extent that the defendants or our colleague may be suggesting the adoption of a narrower per se rule—a rule that would deny First Amendment protection to speech contained in routine reports or made in the performance of routine job functions—we strongly disagree. The mere fact that a public employee exposes individual wrongdoing or government misdeeds when making a regular as opposed to a special report does not, by itself, result in the denial of First Amendment protection. Whether a job duty is routine or non-routine is a far less important factor for purposes of First Amendment analysis than the content of the public employee's speech.

Regardless of the form in which a government worker makes charges of corruption, criminal misconduct, or public waste, such charges raise serious public concerns that merit careful assessment and justify full application of the *Connick* principles. Indeed, a report that would ordinarily be considered routine by virtue of its form may well become non-routine by virtue of its content, such as when it contains serious charges of official wrongdoing. Finally, a per se rule stripping all First Amend-

---

**7.** The special concurrence claims that *Roth,* 856 F.2d 1401, and its progeny are responsible for a lopsided circuit split, *post* at 1187–88, but the cases discussed in the text reveal that the weight of authority in other circuits accords with our precedents. Although in some instances other circuits have held that public employees' speech pursuant to job-related duties did not involve matters of public concern, it was ordinarily because the speech at issue primarily involved either personal grievances or the "routine discharge of assigned functions, where there is no suggestion of public motivation." *Delgado,* 282 F.3d at 519; *see also Dill,* 155 F.3d at 1202–03; *Morris v. Crow,* 142 F.3d 1379, 1381–83 (11th Cir.1998); *cf. Oladeinde v. City of Birmingham,* 230 F.3d 1275, 1292 (11th Cir.2000). Only the Fourth Circuit seems to be moving toward a rule that public employees' speech in the course of carrying out employment obligations is not protected under the First Amendment. *See Urofsky v. Gilmore,* 216 F.3d 401, 407–08 (4th Cir.2000) (en banc). Aside from *Urofsky,* all of the cases that our colleague cites, *post* at 1187–88, either have been narrowed by one or more of the decisions cited in the text above, or they do not stand for the broad rule ascribed to them. *Compare Terrell v. Univ. of Tex. Sys. Police,* 792 F.2d 1360, 1362 (5th Cir.1986), *with Kennedy v. Tangipahoa Parish Library Bd. of Control,* 224 F.3d 359, 367–376 (5th Cir.2000); *compare Thomson v. Scheid,* 977 F.2d 1017, 1021 (6th Cir.1992), *with Rodgers v. Banks,* 344 F.3d 587, 597–602 (6th Cir.2003), and *Taylor v. Keith,* 338 F.3d 639, 643–46 (6th Cir.2003); *compare Gonzalez v. City of Chicago,* 239 F.3d 939, 941–942 (7th Cir.2001), *with Delgado v. Jones,* 282 F.3d 511, 519 (7th Cir.2002); *compare Buazard v. Meridith,* 172 F.3d 546, 548 (8th Cir.1999), *with Herts v. Smith,* 345 F.3d 581, 585–86 (8th Cir.2003); *compare Koch v. City of Hutchinson,* 847 F.2d 1436 (10th Cir.1988), *with Dill v. City of Edmond,* 155 F.3d 1193, 1202–03 (10th Cir. 1998). Accordingly, unlike our colleague, we do not perceive any "deep confusion" in the other circuits; rather, these cases point to the nearly unanimous opposition of the federal courts to the imposition of a per se rule denying all First Amendment protection to public employees' speech pursuant to their job-related duties.

ment protection from speech uttered in the performance of routine, as opposed to non-routine, job functions would be inconsistent with the very nature of the *Connick* test which contains a second step that requires us to balance various factors, including some of those that concern our concurring colleague.

In short, that Ceballos prepared his memorandum in fulfillment of a regular employment responsibility does not serve to deprive him of the First Amendment protection afforded to public employees. Not only our own precedent, but sound reason, Supreme Court doctrine, and the weight of authority in other circuits support our rejection of a per se rule that the First Amendment does not protect a public employee simply because he expresses his views in a report to his supervisors or in the performance of his other job-related obligations. Such speech, like all other public employee speech, is subject to the full two-part *Connick* test described above.

### 2. Balancing Test

■ Even though Ceballos's speech constituted a matter of public concern, it is not protected by the First Amendment unless the court also finds that his interest in the speech outweighs the government's interests "in promoting workplace efficiency and avoiding workplace disruption." *Rivero,* 316 F.3d at 865; *accord Pickering v. Bd. of Educ.,* 391 U.S. 563, 571, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The employer bears the burden of proving that the balance of interests weighs in its favor. *Johnson,* 48 F.3d at 426. The " 'more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made.' " *Id.* (quoting *Hyland v. Wonder,* 972 F.2d 1129, 1139 (9th Cir.1992)).

The defendants contend that under our holding in *Brewster,* the *Pickering* balancing test favors them because Ceballos

spoke to other government employees and not to the public or the media. While in *Brewster* we stated that a "narrow, limited focus and a limited audience weigh against a claim of protected speech," 149 F.3d at 981 (internal quotation marks omitted), we also recognized that "the private nature of the statement does not remove it from the realm of 'public concern' altogether." *Id.* (quoting *Rankin v. McPherson,* 483 U.S. 378, 387 n. 11, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)); *see also Ulrich,* 308 F.3d at 979; *Nunez,* 169 F.3d at 1228. Indeed, the Supreme Court has ruled that speech need not be made publicly in order to come within the protection of the First Amendment. *See Givhan v. Western Line Consolidated Sch. Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). Again, the decisive question is whether the employee spoke with the intention of bringing wrongdoing to light, because we have held that "in a good-faith whistle-blowing context, the breadth of one's audience is irrelevant." *Hufford,* 249 F.3d at 1150.

Assuming, for the purposes of our analysis, that the speech at issue is only the memorandum Ceballos sent to Sundstedt, there can be no disputing the fact that he included the material charging misconduct on the part of a law enforcement officer "to bring wrongdoing to light, not merely to further some purely private interest." *Ulrich,* 308 F.3d at 979 (internal quotations omitted). Even if Ceballos's audience was limited, this factor would provide little support to the individual defendants' claim of disruption and inefficiency under *Pickering* because the speech was uttered in a "good-faith whistleblowing context." *Hufford,* 249 F.3d at 1150.

The defendants next maintain that their interests outweigh those of Ceballos because his charges of misconduct by the deputy sheriff were found to be erroneous

by the *Cusky* court. The falsity of a statement is a factor to be considered in the *Pickering* balance. *Moran v. Washington,* 147 F.3d 839, 849–50 (9th Cir.1998). We have recognized, however, that in order to encourage public employees to speak out on matters of public concern, the First Amendment will ordinarily be held to protect even false statements, because

> while false statements are not deserving, in themselves, of constitutional protection, "erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.' " *New York Times Co. v. Sullivan,* 376 U.S. 254, 271–72, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)).

*Johnson,* 48 F.3d at 424. In *Johnson,* we considered the weight to be accorded in a *Pickering* balancing to false statements made with reckless disregard for the truth. *Johnson,* 48 F.3d at 421–26. While noting that recklessly false statements serve a "very limited" First Amendment interest, *id.* at 426 (citing *Arnett v. Kennedy,* 416 U.S. 134, 162–63, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)), we nonetheless held that even such statements "are not per se unprotected by the First Amendment when they substantially relate to matters of public concern. Instead, the recklessness of the employee and the falseness of the statements should be considered in light of the public employer's showing of actual injury

to its legitimate interests, as part of the *Pickering* balancing test." *Id.* at 424.

Unlike in *Johnson,* there is no evidence here that Ceballos spoke recklessly, or that he acted in bad faith. At most, the evidence suggests that his statements proved to be erroneous. As the individual defendants concede, prosecutors have a duty to disclose information favorable to an accused, including information relating to a witness's veracity and integrity. Good-faith statements made in pursuit of this obligation, even if they may ultimately turn out to be incorrect, do not warrant retaliatory action.[8] Accordingly, if Ceballos's statements in the memorandum to his supervisor are ultimately determined to be erroneous, the erroneous nature of the statements *might* lessen the weight of his interests under the *Pickering* balancing test, but that factor would in any event not be sufficient by itself to deprive Ceballos of all First Amendment protection.[9]

Assuming *arguendo* that Ceballos's limited audience and purportedly erroneous statements diminish the weight of his First Amendment interests, the individual defendants do not meet their burden under *Pickering* because they offer no explanation as to how Ceballos's memorandum to his supervisors resulted in inefficiency or office disruption. Ceballos tried to address the problem initially by reporting the matter to his supervisors, obviously an appropriate way of seeking a responsible solution. *Cf., Moran,* 147 F.3d at 849–50 (holding *Pickering* factors favored defendant where deputy commissioner charged

---

**8.** We do not mean to suggest, however, that every action-critical, corrective, or otherwise—that a public employer takes in response to an employee's good-faith whistleblowing is retaliatory, and thus, impinges on First Amendment rights.

**9.** Ceballos argues that the *Cusky* court's determination that the search warrant affidavit

was acceptable does not show that his statements were incorrect. We may assume that Ceballos's statements were in error, however, because ultimately, for purposes of summary judgment, given the good-faith nature of his statements and the other factors we consider in the *Pickering* balance, our result is no different whether or not Ceballos's assertions were correct.

with carrying out commissioner's public outreach program criticized program and refused to carry it out, thereby undermining commissioner's ability to implement policy initiative and disrupting workings of office); *Pool,* 297 F.3d at 908–09 (holding *Pickering* factors favored defendants where high-profile employee of the sheriff's office, who worked in a (" 'confidential, policy-making, or public contact role,' " made crude public comments regarding the sheriff that detrimentally affected the workings of the office) (quoting *Moran,* 147 F.3d at 846). As the defendants recognize, Ceballos was doing his job by investigating allegations of law enforcement misconduct in a case being prosecuted under his direction and reporting those that appeared to be meritorious to his supervisors. It is difficult to imagine how the performance of one's duties in this manner could be disruptive or inefficient—much less how any such "disruption" or "inefficiency" could outweigh the public's interest in the exposure of corrupt or unlawful practices in the Sheriff's Department. *See Hufford,* 249 F.3d at 1149 (" '[I]t would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office.' ") (quoting *Roth,* 856 F.2d at 1407–08)); *Johnson,* 48 F.3d at 427 ("[T]he County does not have a legitimate interest in covering up mismanagement or corruption and cannot justify retaliation against whistle-blowers as a legitimate means of avoiding the disruption that necessarily accompanies such exposure.") In any event, because the defendants have failed even to suggest disruption or inefficiency in the workings of the District Attorney's Office, there is little for us to weigh in favor of the individual defendants under *Pickering.*

In sum, Ceballos's speech addressed a matter of public concern and his interest in the speech outweighed the defendants' ad-ministrative interests. Thus, we hold that, for summary judgment purposes, his speech was protected by the First Amendment.

## B. The Constitutional Right Was Clearly Established

Even if Ceballos's speech is constitutionally protected, the defendants are nonetheless entitled to qualified immunity if the constitutional right was not clearly established at the time of the alleged violation.

A right is "clearly established" when the contours of the right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. To determine whether qualified immunity applies, we must consider the application of the right in the specific context in question. *Brewster,* 149 F.3d at 977. This does not mean "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," however, but rather that "in the light of preexisting law the unlawfulness must be apparent." *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (internal quotation marks and citations omitted). Indeed, " '[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.' " *Id.* at 741, 122 S.Ct. 2508. In order to find that the law was clearly established, then, "we need not find a prior case with identical, or even 'materially similar,' facts." *Flores v. Morgan Hill Unified Sch. Dist.,* 324 F.3d 1130, 1136–37 (9th Cir.2003) (quoting *Hope,* 536 U.S. at 741, 122 S.Ct. 2508). Instead, we must "determine whether the preexisting law provided the defendants with 'fair warning' that their conduct was unlawful." *Id.* at 1137 (quoting *Hope,* 536 U.S. at 741, 122 S.Ct. 2508).

The individual defendants argue that it was not clearly established that (1) an employee can speak on a matter of public concern when he speaks pursuant to a job responsibility or (2) under the *Pickering* balancing test, Ceballos's statements were protected by the First Amendment.

As discussed above, however, as early as 1988 we held that speech made pursuant to an employment duty can be a matter of public concern. *See, e.g., Roth,* 856 F.2d at 1406; *Pool,* 297 F.3d at 908. The defendants' argument that the law in this respect was not clearly established is therefore without merit.

■ With respect to the *Pickering* test, the defendants contend that the *Pickering* balance favors them because Ceballos spoke only to Sundstedt, not to a larger or public audience, and the statements were determined by the *Cusky* court to be false. Yet even if Ceballos spoke only to Sundstedt, and even if the statements were incorrect (there is no evidence that they were made in bad faith or recklessly), the defendants make no assertion that Ceballos's speech caused actual, or even potential, office disruption or inefficiency. Thus, this argument fails as well.

We have recognized that, although the qualified immunity inquiry in a *Pickering* balancing case is context-specific, *see Brewster,* 149 F.3d at 979–80, where the balancing factors weigh heavily in favor of the employee the law is clearly established, and qualified immunity is therefore unavailable. *See Gilbrook,* 177 F.3d at 867–70; *Lytle v. Wondrash,* 182 F.3d 1083, 1089 (9th Cir.1999). Moreover, "there is a series of cases in the Ninth Circuit establishing that the public's interest in learning about illegal conduct by public officials and other matters at the core of the First Amendment protection outweighs a [public] employer's interest in avoiding a mere *potential* disturbance to the workplace." *Keyser,* 265 F.3d at 748 (discussing our

previous holdings including *Gilbrook,* 177 F.3d at 867–70, *Roth,* 856 F.2d at 1403–08, and *Johnson,* 48 F.3d at 425–28). Given our prior cases, therefore, the defendants were on fair notice that the *Pickering* balance strongly favored Ceballos. The law, therefore, was clearly established in this respect as well.DECIDED:

## C. The Officials' Acts Were Not Objectively Reasonable

There is one more hurdle that Ceballos must clear. Whether or not the law was clearly established, Ceballos may not prevail if the official's "mistake as to what the law requires is [objectively] reasonable." *Saucier,* 533 U.S. at 205, 121 S.Ct. 2151. The individual defendants argue that their conduct was objectively reasonable because the undisputed evidence shows that all of the "employment decisions of which Plaintiff complained were undertaken for non-retaliatory reasons."

■ The defendants are mistaken. It is possible that they will be able to show at trial that the adverse acts Ceballos alleges were not taken in retaliation for his constitutionally protected speech. However, "[a]s with proof of motive in other contexts, this element of a First Amendment retaliation suit ... involves questions of fact that normally should be left for trial." *Ulrich,* 308 F.3d at 979 (citing *Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999)). They may not be resolved on summary judgment. At trial, the individual defendants will have the opportunity to refute Ceballos's evidence that they acted with a retaliatory motive, or to prove that they would have taken the same actions for other reasons even in the absence of such a motive. *See Ulrich,* 308 F.3d at 976–77.

The individual defendants make no argument that, in light of our clearly established law, it was objectively reasonable

for them to take the adverse employment actions against Ceballos on the basis of the retaliatory motives that he alleges they possessed. Nor could they. Retaliatory motives do not constitute a sound basis for employment decisions. Here, with all disputed factual questions resolved in favor of Ceballos and drawing all reasonable inferences in his favor, "the *Pickering* balancing so clearly weighs in favor of[Ceballos] that it was patently unreasonable for defendants to conclude that the First Amendment did not protect his speech." *Gilbrook,* 177 F.3d at 870.

The individual defendants' actions were not objectively reasonable. We therefore reject the qualified immunity defense.[10]

## II. County Defendants and Sovereign Immunity

Ceballos next claims that the County of Los Angeles and Garcetti, in his official capacity as District Attorney of Los Angeles County, are liable for the alleged violation of his constitutional rights. The district court did not reach the merits of these claims; rather, it held that they were barred (directly or indirectly) by the Eleventh Amendment to the United States Constitution, because the Los Angeles County District Attorney acted on behalf of the state when he took the actions of which Ceballos complains.

■■■ Counties are not entitled to sovereign immunity. *Eason v. Clark County School Dist.,* 303 F.3d 1137, 1141 (9th Cir. 2002) (citing *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890)). Here, however, the County can be held liable only if the District Attorney acted as a county officer. If the District Attorney was a state officer when he en-

gaged in the acts of which Ceballos complains, he is entitled to Eleventh Amendment immunity (to the extent that he is sued in his official capacity) and the County cannot be held liable for those acts. Thus liability for both county defendants depends on the same question: whether the District Attorney acted on behalf of the state or the county. With that in mind, we now analyze the role of the District Attorney in relation to the proceeding before us.

Ordinarily, an official designated as an official of a county—as is the District Attorney of the County of Los Angeles—is a county official for all purposes. Some officials, however, serve two masters. Among them are California's 58 district attorneys: While these officers are elected by and for the counties, they prosecute cases on behalf of the state. In such mixed circumstances, we determine whether the officer is a state or a county official by examining state law to determine whether the particular acts the official is alleged to have committed fall within the range of his state or county functions. *McMillian v. Monroe County,* 520 U.S. 781, 785–86, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). 3469 The California Supreme Court has held that a district attorney is a state official when he acts as a public prosecutor, while in other functions he acts on behalf of the county:

He is at once the law officer of the county and the public prosecutor. While in the former capacity he represents the county and is largely subordinate to, and under the control of, the [county] board of supervisors, he is not so in the latter. In the prosecution of criminal cases he

---

**10.** Although the district court did not reach the question, at oral argument the defendants asked us to hold that the undisputed facts show that Ceballos's speech was not a substantial or motivating factor causing the ad-

verse employment actions taken against Ceballos. We are unable to do so. On the basis of the record before us, a reasonable jury could infer that Ceballos's speech was a substantial motivating factor.

acts by the authority and in the name of the people of the state.

*Pitts v. County of Kern,* 17 Cal.4th 340, 70 Cal.Rptr.2d 823, 949 P.2d 920, 932–33 (Cal. 1998). The *Pitts* court thus concluded that a claim alleging prosecutorial misconduct is a claim against the state. *Id.* at 930–37; *see also Weiner,* 210 F.3d at 1026, 1030 (holding the San Diego County District Attorney acted on behalf of state in allegedly hiding exculpatory evidence from criminal defendant, while noting that its holding did not imply that "district attorneys in California are state officers for all purposes"). District attorneys performing investigatory and other functions, however, are officers of the county. *See, e.g., Bishop Paiute Tribe v. County of Inyo,* 275 F.3d 893, 906–10 (9th Cir.2002) (reviewing state constitution and statutes and concluding that district attorney and sheriff acted as county officials in obtaining and executing search warrant), *vacated on other grounds,* 538 U.S. 701, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003).

Whether the District Attorney acted on behalf of the county or the state thus turns on whether the personnel actions alleged by Ceballos are part of the District Attorney's prosecutorial functions or whether he was performing administrative or other non-prosecutorial duties. The California courts have not defined the precise characteristics that distinguish a district attorney's prosecutorial function from his other functions. As *Bishop Paiute Tribe* noted, however, a similar issue as to whether a prosecutor was acting in his prosecutorial capacity, as opposed to an administrative or investigative capacity, arises in determining whether he is entitled to absolute or qualified immunity under § 1983; we may look for guidance to cases addressing that issue. *See id.* at 908–09.[11]

■ A state prosecutor "is entitled to absolute immunity from liability under § 1983 for violating a person's federal constitutional rights when he or she engages in activities 'intimately associated with the judicial phase of the criminal process.' " *Broam v. Bogan,* 320 F.3d 1023, 1028 (9th Cir.2003) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). Only qualified immunity is available, however, to a prosecutor "performing investigatory or administrative functions." *Broam,* 320 F.3d at 1028. While the line between the functions is not entirely clear, *id.* at 1029, it is clear that

11. *Bishop Paiute Tribe, Pitts,* and *Weiner* all considered whether an officer acted on behalf of the state or the county for the purpose of establishing whether there could be liability under § 1983. Whereas political subdivisions of states, along with their agencies and officials are "person[s]" for the purpose of § 1983 liability, *see Monell,* 436 U.S. at 663, 98 S.Ct. 2018; 18 U.S.C. § 1983 (providing only that "person[s] ... shall be liable"), states, state agencies, and state officials sued in their official capacity are not. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Although these cases did not consider the Eleventh Amendment issue we address here, the same distinction, between states and state officials on the one hand and counties and county officials on the other, controls the outcome under both analyses. *Cf. Aguon v. Commonwealth Ports Auth.,* 316 F.3d 899, 901–02 (9th Cir.2003) (applying factors from Eleventh Amendment analysis to determine whether an entity is arm of the state and therefore not a "person" under § 1983); *Cortez v. County of Los Angeles,* 294 F.3d 1186, 1188 (9th Cir.2002) ("[A] state and its officials sued in their official capacity are not considered 'persons' within the meaning of § 1983, due to the sovereign immunity generally afforded states by the Eleventh Amendment."). Similarly, the issue whether an officer is acting as a prosecutor for purposes of determining absolute or qualified immunity in § 1983 actions involves the same considerations as the issue whether he is acting as a prosecutor for purposes of determining sovereign immunity under the Eleventh Amendment. Thus, the § 1983 cases we discuss guide our decision here.

"absolute prosecutorial immunity [is justified] only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." *Burns v. Reed*, 500 U.S. 478, 494, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). Actions for which there is absolute immunity include, for example, preparing and filing an information and a motion for an arrest warrant, *Kalina v. Fletcher*, 522 U.S. 118, 129, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997), initiating a prosecution, *Imbler*, 424 U.S. at 430, 96 S.Ct. 984, and withholding evidence during trial, *id.* at 431–32 n. 34, 96 S.Ct. 984. Actions that are not directly related to the judicial process do not give rise to absolute immunity, even if they occur after a prosecution is initiated. *Broam*, 320 F.3d at 1031. Thus, when a prosecutor acts as an investigator, *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 n. 5, 113 S.Ct. 2606, 125 L.Ed.2d 209, testifies as a witness in an *ex parte* proceeding, *Dela Cruz v. Kauai County*, 279 F.3d 1064, 1067 (9th Cir.2002), or performs administrative duties, *Broam*, 320 F.3d at 1029, he receives only qualified immunity.

█ Ceballos alleges that the District Attorney's Office took several retaliatory actions against him: that he was (1) demoted from his position of calendar deputy; (2) given the choice to transfer to the El Monte Branch or to remain in Pomona but be re-assigned to filing misdemeanors (a position usually assigned to junior deputy district attorneys); (3) removed from prosecuting the only murder case he was handling at the time; (4) precluded from handling future murder cases; and (5) denied a promotion.[12]

Among these alleged acts of retaliation, only the removal of Ceballos from a particular murder case he was handling fell within the District Attorney's prosecutorial function, because it alone is "intimately associated with the judicial phase of the criminal process." *Id.* at 1028. With that one exception, Ceballos does not complain of actions taken as part of a prosecution. He does not argue, for example, that there was a violation when the District Attorney's Office decided to pursue the *Cusky* prosecution despite his recommendation that it be dismissed. Neither does he complain of his removal from the *Cusky* case. Rather he challenges Garcetti's personnel decisions concerning his promotion, demotion, and transfer-decisions squarely within the District Attorney's administrative function. Even the decision not to reassign Ceballos to future murder cases was a personnel decision, and was unrelated to any particular prosecution or ongoing judicial proceeding. Indeed, the defendants' own arguments lend support to our conclusion that the alleged retaliatory acts were not prosecutorial in nature: The individual defendants, including Garcetti, do not seek dismissal on the basis of absolute immunity for the acts they allegedly took against Ceballos. Instead, they seek qualified immunity, implicitly acknowledging that the actions were not prosecutorial, but administrative.

In sum, the District Attorney's Office and its then-head, Garcetti, were carrying out their county functions when they allegedly engaged in the retaliatory acts Ceballos describes. Garcetti is, therefore, not entitled to Eleventh Amendment immunity, and thus the County may not seek summary adjudication on the ground that he was acting on behalf of the state. Because the district court did not decide any other issues pertaining to the county de-

---

**12.** While it is not altogether clear, we assume that Ceballos's allegations that Najera and Sundstedt were "rude and hostile" towards him, gave him the "the silent treatment," and "threatened" him are not intended as allegations of independent harms but rather as support for his assertion that the other alleged harms were retaliatory in nature.

fendants, we decline to do so here. Accordingly, we reverse.

### III. Intentional Infliction of Emotional Distress

Having granted final judgment against Ceballos with respect to all of his federal claims, the district court declined to exercise jurisdiction over his state law claim of intentional infliction of emotional distress. Because we reverse the district court's judgment on the federal claims, we reverse its determination as to the state law claim as well.

### CONCLUSION

For the foregoing reasons, we reverse the district court and remand for further proceedings.

**REVERSED and REMANDED.**

O'SCANNLAIN, Circuit Judge, specially concurring:

I write separately because although I concur in the court's opinion that *Roth v. Veteran's Administration of the United States,* 856 F.2d 1401 (9th Cir.1988), controls the result, I believe that *Roth* was wrongly decided and that it ought to be overruled, perhaps even by our court's rehearing the present case en banc.

### I

As we recently recounted, *see Roe v. City of San Diego,* 356 F.3d 1108, 1114–15 (9th Cir.2004), for much of this Nation's history, our courts generally accepted then-Judge Holmes's immoderately narrow view of the First Amendment rights of public employees: "[A constable] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517 (Mass.1892). Beginning in the mid-part of the twentieth century, in response to the proliferation of loyalty oaths and other grave restrictions on the expressive and associational rights of public employees, the Supreme Court dramatically began to cast aside the Holmesian logic. *See, e.g., Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (invalidating state statutes denying public employment on the basis of membership in the Communist Party or other subversive political organizations); *Cramp v. Board of Public Instruction,* 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961) (invalidating state loyalty oath requiring state employees to deny membership in the Communist Party and to refuse to "lend aid, support, advice, counsel or influence to the Communist Party"); *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (invalidating loyalty oath prohibiting membership in a "communist front" or other "subversive" organization).

The Supreme Court's burgeoning recognition of public employees' First Amendment rights reached its first apex in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), where the Court held unconstitutional the dismissal of a public school teacher who had published in his local newspaper a letter that sharply criticized the Board of Education and superintendent of schools. Striving to accommodate the expressive rights of public employees with the special needs of the government in its capacity as a day-to-day employer, the *Pickering* Court explained:

The theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected. At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between

the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Id.* at 568, 88 S.Ct. 1731 (citation and quotations omitted). Applying its test to the case at bar, the Court concluded that "absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 574, 88 S.Ct. 1731.

Over the course of the ensuing decade and a half, lower courts struggled to define the terms of, and to apply, *Pickering's* amorphous balancing test. In apparent recognition, the Supreme Court attempted to clarify its doctrine in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1982). There, the Justices confronted a challenge brought by a public employee who claimed that her First Amendment rights had been violated when she was fired after having circulated an internal office questionnaire that (in the Court's words) was "most accurately characterized as an employee grievance concerning internal office policy." *Id.* at 154, 103 S.Ct. 1684. Focusing largely on whether the employee's speech touched on matters of "public concern" as "determined by the content, form, and context of a given statement," *id.* at 147–48, 103 S.Ct. 1684, the Court also took pains to recognize that

"[t]he repeated emphasis in *Pickering* on the right of a public employee 'as a citizen, in commenting upon matters of public concern,' was not accidental," *id.* at 143, 103 S.Ct. 1684, and it

h[e]ld only that when a public employee speaks not *as a citizen* upon matters of public concern, but instead *as an employee* upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147, 103 S.Ct. 1684 (emphasis added).

## II

It was against this backdrop that in *Roth,* a three-judge panel of our court held that when a public employee speaks on matters of public importance, his or her speech falls automatically within the protective ambit of the First Amendment.[1] *Roth,* 856 F.2d at 1406 ("Both the content and context of Roth's speech reveal that it concerned matters of public importance, and thus deserves protection."); *see also id.* ("Roth's speech concerned matters of public importance and thus was protected."). Yet in so holding, *Roth* minimized—indeed, it entirely ignored—the significance of *Connick's* distinction between speech offered by an public employee acting *as an employee* in carrying out his or

---

**1.** Of course, the fact that certain speech by public employees may fall within the scope of the First Amendment does not mean that governmental constraints on such speech are unconstitutional *per se.* As we explained in *Brewster v. Bd. of Educ.,* 149 F.3d 971, 979 (9th Cir.1998) (citations and quotations omitted):

[T]he fact that an employee's expression touches on an issue of public concern does not automatically entitle him to recovery.

The public concern prong is a necessary, but not a sufficient, condition of constitutional protection. It merely brings the claim within the coverage of the First Amendment, and thus ensures that a court will test the reasons for restriction against first amendment standards. In determining whether speech involving a matter of public concern merits constitutional protection, courts engage in a balancing test, first announced in *Pickering.* . . .

her ordinary employment duties and speech spoken by an employee acting *as a citizen* expressing his or her personal views on disputed matters of public import. Instead, *Roth* asserted that the relevant constitutional inquiry focuses solely on the "point of the speech in question: Was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Roth*, 856 F.2d at 1405 (*quoting Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir. 1987)) (*quoting Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir.1985)). As the majority today reiterates, *Roth's* formulation led inexorably to the conclusion that "it is only when it is clear that ... the information would be of *no* relevance to the public's evaluation of the performance of governmental agencies that speech of government employees receives no protection under the First Amendment." Maj. Op. at 1174 (*quoting Ulrich v. City & County of San Francisco*, 308 F.3d 968, 978 (9th Cir.2002)) (quotation omitted) (emphasis in original).

That conclusion—that the First Amendment encompasses *any* speech by a public employee that touches upon matters of public importance, notwithstanding what might best be described as the "role" of its speaker—is at odds with the Supreme Court's instruction in *Connick*. *Connick* teaches us that the relevant constitutional distinction is not merely between speech touching on matters of public significance and speech that does not, but between speech spoken "*as a citizen* upon matters of public concern [and that offered] *as an employee* upon matters only of personal interest." *Id.* at 147, 103 S.Ct. 1684 (emphasis added); *see also United States v. Nat'l Treas. Employees Union*, 513 U.S. 454, 465–466, 115 S.Ct. 1003, 130 L.Ed.2d 964 (highlighting that "with few exceptions, the content of respondents' mes-

sages has nothing to do with their jobs" and that virtually no aspect of the claimants's expressive activity "has any relevance to their employment," and pointedly observing that "[W]e have applied *Pickering's* balancing test only when[as in this case] the employee spoke '*as a citizen* upon matters of public concern' rather than '*as an employee* upon matters only of personal interest.' ") (quoting *Connick* with its own added emphasis); *see also id.* at 480, 486, 115 S.Ct. 1003 (O'Connor, J., dissenting in part) (arguing that the relevant speech restrictions were unconstitutional only insofar as they related to "expressive activities that bear no nexus to Government employment," and suggesting that the relevant regulations should be severed because similar concerns did not apply where "the subject matter is directly related to the individual's official duties"). *Roth* thus collapses a critical dimension of *Connick's* two-pronged inquiry: By focusing only on *Connick's* public concern/purely personal interest axis, *Roth* improperly quashes the controlling caselaw's accompanying distinction between an employee's viewpoint-laden personal speech and his or her ordinary job-related speech.

### III

In fairness to the *Roth* court, *Connick* did not fully rationalize the distinction it drew between speech offered by a public employee acting *as an employee* carrying out his or her ordinary job duties and that spoken by an employee acting *as a citizen* expressing his or her personal views on disputed matters of public import. Nor, for the most part, have the six other circuits which—in contrast to this court—at various points reiterated the importance of *Connick's* citizen speech-employee speech distinction. *See, e.g., Gonzalez v. City of Chicago*, 239 F.3d 939, 942 (7th Cir.2001) ("[T]here are still limits in public employment as to what can be fairly characterized as speech 'as a citizen' on a matter of

public concern. Speech exercised by a public employee in the course of his employment will rarely fit the mold of private speech by a citizen."); *Urofsky v. Gilmore,* 216 F.3d 401, 407 (4th Cir.2000) (en banc) ("[C]ritical to a determination of whether employee speech is entitled to First Amendment protection is whether the speech is 'made primarily in the [employee's] role as citizen or primarily in his role as employee.' ") (*quoting Terrell v. Univ. of Tex. Sys. Police,* 792 F.2d 1360, 1362 (5th Cir.1986) (alteration in original)); *Buazard v. Meridith,* 172 F.3d 546, 548–49 (8th Cir.1999) ("Unless the employee is speaking as a concerned citizen, and not just as an employee, the speech does not fall under the protection of the First Amendment.... [T]here is no indication that[the plaintiff], in making, or refusing to change, his statements, was taking any action as a concerned citizen, rather than simply as an employee following orders or refusing to follow them."); *Gillum v. City of Kerrville,* 3 F.3d 117, 120–21 (5th Cir. 1993) ("[W]e d[o] not focus on the inherent 'importance' of the subject matter of the speech, but on the extent to which the terminated employee spoke as a citizen or employee...."); *Thomson v. Scheid,* 977

F.2d 1017, 1020 (6th Cir.1992) ("First Amendment protection extends to a public employee's speech when he speaks as a citizen on a matter of public concern, but does not extend to speech made in the course of acting as a public employee."); *Koch v. Hutchinson,* 847 F.2d 1436, 1442–43 (10th Cir.1988) (en banc) (declining "to establish a per se rule exempting speech made in the course of an employee's official duties," but viewing "that fact as militating against a finding that the speech addressed matters of public concern" and noting that "it is a significant factor in the balancing required under *Pickering*").[2] Notwithstanding the relative opacity of *Connick's* explanation for its differentiation between citizen and employee speech, however, there is a strong First Amendment basis for its having drawn such a distinction.

### A

While it has rarely been stated explicitly by the Supreme Court, the implicit premise underlying the First Amendment's hostility toward viewpoint-driven rules abridging the freedom of speech is that such constraints impermissibly infringe upon individuals' freedom of choice to express

---

**2.** Admittedly, the failure of these courts fully to rationalize their recognition of *Connick's* distinction among the roles of a public-employee speaker has in some instances emboldened subsequent panels putatively to distinguish these cases, or otherwise to attempt to narrow the scope of their holdings. *Cf. Taylor v. Keith,* 338 F.3d 639, 643–46 (6th Cir. 2003); *Delgado v. Jones,* 282 F.3d 511, 519 (7th Cir.2002); *Kennedy v. Tangipahoa Parish Library Bd. of Control,* 224 F.3d 359, 367–376 (5th Cir.2000); *Dill v. City of Edmond,* 155 F.3d 1193, 1202 (10th Cir.1998). At times, these efforts have been particularly thin, *e.g., Delgado,* 282 F.3d at 519 ("[Officer] Delgado's communications with his superiors were designed not only to convey information of possible crimes, but also *additional facts* that were relevant to the manner and scope of any subsequent investigation.") (emphasis in orig-

inal); at others, they have provoked great consternation within those courts. *E.g., Teague v. City of Flower Mound,* 179 F.3d 377, 383 (5th Cir.1999) ("Moreover, the rule of orderliness forbids one of our panels from overruling a prior panel; to the extent that *Wilson's* language contradicts the 'primary role'/balancing test of *Terrell* (and *Moore*), decided years earlier, it is of no effect."), *ironically, itself disregarded by Kennedy,* 224 F.3d at 370 n. 13 ("[T]he rule of orderliness has little persuasive force when the prior panel decision at issue conflicts with a Supreme Court case to which the subsequent panel decision is faithful.").

In any event, such deep confusion within the circuits over the scope of *Connick*—indeed, over the scope of their own cases interpreting *Connick*—seems a clarion call for higher review.

*their personal* opinions or to otherwise express *themselves.* As the Court put the point in *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 75–76, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (emphasis added) (internal citations omitted):

> [T]here are deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform *their beliefs and associations* to some state-selected orthodoxy. The First Amendment is not a tenure provision, protecting public employees from actual or constructive discharge. The First Amendment prevents the government ... from wielding its power to interfere with its *employees' freedom to believe and associate, or to not believe and not associate.*

*See also Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) ("For at least a quarter century, this Court has made clear that ... the government ... may not deny a benefit to a person on a basis that infringes *his* constitutionally protected interests—especially *his interest in freedom of speech.* ... [M]ost often we have applied this principle to denials of public employment.") (emphasis added).

The problem is that when public employees speak in the course of carrying out their routine, required employment obligations, they have no *personal* interest in the content of that speech that gives rise to a First Amendment right. Instead, their speech is, in actuality, the State's. I do not dispute the court's characterization of the relevant facts of this case—which it presents, as it must, in the light most favorable to Ceballos, *see Coszalter v. City*

*of Salem,* 320 F.3d 968, 973 (9th Cir. 2003)—but I believe that actually quoting Ceballos's own statement of the operative facts may be particularly illustrative here. In his opposition to the defendants' motion for summary judgment below, Ceballos described as follows the basis for the speech that he now claims to fall within the protections of the First Amendment:

> Pursuant to his duties as a prosecutor, [Ceballos] wrote a memo expressing his concerns about the veracity of the officers in [*People v. Cuskey*]. He then informed his supervisors he intended to comply with his duties under *Brady v. Maryland,* [373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)], which required him to turn his memo over to defense counsel.

*Plaintiff's Statement in Opposition to Defendants' Separate Statement of Uncontroverted Facts and Conclusions of Law* at 4. Counsel for plaintiff reiterated that description of the facts at oral argument:

> Ceballos prepared a memorandum describing [the results of his investigation] and told his supervisors that he should disclose that information to the defense under *Brady v. Maryland* as he is required to do so. This is a prosecutorial function that he's engaged in at this time, when he's doing what he is supposed to do.

As these statements indicate, Ceballos had no *personal* stake (other than in doing his job well), and no cognizable First Amendment interest, in the speech for which he now seeks protection—his performance of the basic communicative duty *Brady* imposes on "the prosecution." *See Brady,* 373 U.S. at 87, 83 S.Ct. 1194.[3] Indeed, as

---

**3.** Plaintiff's own characterization of the relevant conduct—"This is a prosecutorial function that [Ceballos is] engaged in at this time, when he's doing what he is supposed to do"—more than effectively disposes of the majority's suggestion that Ceballos may not have

been acting in a governmental capacity with respect to the speech giving rise to this litigation. *Cf.* Maj. Op. at 1175–76 n. 5. To the extent the majority's response strains narrowly to construe Ceballos's repeated statements about his *Brady* obligations—as referring

the Supreme Court has explained, "[t]he prosecutor's office is an entity and as such it is the spokesman for the Government. A [statement] made by one attorney must be attributed, for these purposes, to the Government." *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (*citing Restatement (Second) of Agency* § 272). Of course, "the Government" has no First Amendment rights. Only individuals do.

## B

*Roth's* extension of First Amendment protections to such routine, required job-related activity effectively has—no less than an extension of such safeguards to the personnel grievances at issue in *Connick* would have—"plant[ed] the seed of a constitutional case" in every task that every public employee ever performs, every time that any public employee merely does "what he is supposed to do." *Connick*, 461 U.S. at 149, 103 S.Ct. 1684. At bottom, after all, everything a public employee does in the course of carrying out the requirements of his or her job ultimately is connected to the public interest and relevant to citizens' "making informed decisions about the operation of their government," *Coszalter*, 320 F.3d at 973. *Terrell*, 792 F.2d at 1360 ("Because almost anything that occurs within a public agency could be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee."); *Gillum*, 3 F.3d at 120–21 ("[Our] focus on the hat worn by the employee when speaking rather than upon

the 'importance' of the issue reflects the reality that at some level of generality almost all speech of state employees is of public concern.").

Indeed, with *Roth* as precedent and now *Ceballos* on the books, what federal or state employment-based decision can possibly evade intrusive federal constitutional review? Suppose that, instead of retaining private counsel as it has here, the County had provided its own staff attorney representation. Suppose further that the deputy county counsel assigned to defend this case had (just like the majority) quite mistakenly, but also quite sincerely, come to the conclusion that Ceballos indeed has a viable First Amendment retaliation claim and, consequently, went so far as to file a brief in this court not only agreeing with the claims made by Ceballos's counsel, but providing additional arguments to support them. Could the County discipline its counsel without fear of being hauled into federal court to defend itself against allegations of having committed a constitutional violation? Evidently not—for as the majority makes pellucid today, *Roth* and its progeny would enable such counsel plausibly to claim some personal stake in the message conveyed by that brief. This is precisely the kind of absurd result that *Connick* sought to avoid by stressing the distinction between employee and citizen speech:

> The repeated emphasis in *Pickering* on the right of a public employee 'as a citizen, in commenting upon matters of public concern,' was not accidental.

merely to his internal office communications—such an unduly constricted construction is utterly belied by the reality of this lawsuit. Let us not forget that Ceballos's action is predicated upon an allegation of retaliation that supposedly stemmed from the facts that: pursuant to *Brady*, he informed defense counsel that he thought the *Cuskey* search warrant affidavit contained false state-

ments; turned his *Brady* memorandum over to the defense; and eventually testified about the contents of that *Brady* memorandum. *See* Maj. Op. at 1171. In each of those instances, Ceballos was simply "doing what he was supposed to do" as a deputy district attorney carrying out non-discretionary quintessentially "prosecutorial function[s]."

This language, reiterated in all of *Pickering's* progeny, reflects both the historical evolvement of the rights of public employees, and the common sense realization that government offices could not function if every employment decision became a constitutional matter. *Connick,* 461 U.S. at 143, 103 S.Ct. 1684.

### C

Finally, holding as *Roth* did that the First Amendment protects speech offered by a public employee in the course of carrying out his or her ordinary job responsibilities "creates a fundamental and unnecessary schism" between the Supreme Court's caselaw addressing speech by public employees and its caselaw addressing speech that otherwise is government-funded or state-sponsored. *Urofsky,* 216 F.3d at 408 n. 6. Consider the Supreme Court's instruction in *Rosenberger v. Rector and Visitors of the Univ. of Va.,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (emphasis added):

> [W]hen the State is the speaker, it may make content-based choices. When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed *when it is the speaker or when it enlists private entities to convey its own message.* In the same vein, in *Rust v. Sullivan,* [500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ], we upheld the government's prohibition on abortion-related advice applicable to recipients of federal funds for family planning counseling. There, the government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to *its own program.* We recognized that when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it

wishes. 500 U.S. at 194, 111 S.Ct. 1759. When the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee.

*See also Rust,* 500 U.S. at 198–99, 111 S.Ct. 1759 ("[E]mployees remain free ... to pursue abortion-related activities when they are ... acting as private individuals."). Writing for the *Urofsky* en banc court, Judge Wilkins adeptly explained the appropriately analogous nature of these two lines of authority:

> In both situations—public employee speech and government-funded speech—the government is entitled to control the content of the speech because it has, in a meaningful sense, "purchased" the speech at issue through a grant of funding or payment of a salary. The limits of government control are similar in both types of cases, as well: Just as the government as provider of funds cannot dictate the content of speech made outside the confines of the funded program, *see [Rust v. Sullivan,* 500 U.S. 173,] at 198, 111 S.Ct. 1759, 114 L.Ed.2d 233, the government as employer is restricted in its ability to regulate the speech of its employees when they speak not as public employees, but as private citizens on matters of public concern.

*Urofsky,* 216 F.3d at 408 n. 6. There simply is no plausible basis for *Roth's* holding that the government may not exercise control over its employees' routine job-related speech, when it assuredly may exercise precisely such control over the speech it subsidizes through its funding decisions.

### D

The majority's response is long on policy, but short on the law. Its argument is seductively simple: Because whistle-blow-

ers play an important role in rendering government accountable, the First Amendment must protect their whistleblowing activities. Maj. Op. at 1174–76. How can anyone disagree with that general principle? Those who "blow the whistle" on government corruption or mismanagement do deserve reasonable legal protections, and such protections most certainly play an important role in discouraging official misfeasance by facilitating wider public exposure of improper conduct—and the identities of those miscreants responsible for it.

Indeed, were I member of Congress charged with making laws that promote sound public policy—and not merely a federal judge charged with interpreting the Constitution—I might well have voted in favor of legislation like the federal Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1111 (codified in scattered sections of 5 U.S.C.), as modified by the Whistleblower Protection Act of 1989, Pub.L. No. 101–12, 103 Stat. 16 (codified in scattered sections of 5 U.S.C.). It provides, *inter alia*, that no federal

employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall ... take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of—

(A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences ... a violation of any law, rule, or regulation....

5 U.S.C. § 2302(b)(8) (enumeration omitted).

Or, were I a state legislator, perhaps I would have voted to enact a law like the California Whistleblower Protection Act, Cal. Gov't Code § 8547 *et seq.* It imposes severe criminal liability upon, and establishes a private cause of action for both actual and punitive damages against, "[a]ny person who intentionally engages in acts of reprisal, retaliation, threats, coercion, or similar acts against a state employee or applicant for state employment for having made a protected disclosure," Cal. Gov't Code § 8547.8(b) & (c), which state law in turn defines as:

any good faith communication that discloses or demonstrates an intention to disclose information that may evidence ... any activity by a state agency or by an employee that is undertaken in the performance of the employee's official duties ... and that is in violation of any state or federal law or regulation, including, but not limited to, corruption, malfeasance, bribery, theft of government property, fraudulent claims, fraud, coercion, conversion, malicious prosecution, misuse of government property, or willful omission to perform duty....

Cal. Gov't Code § 8547.2(b) & (d). How strange it must now be for the hundreds, if not the thousands, of legislators throughout this country who have voted to enact or to retain such laws now to discover that their votes were essentially meaningless—that the First Amendment already provided public employees with protections coextensive with, and in many respects even greater than those purportedly conferred by, the legislation they crafted and helped shepherd through their state legislative processes. *See, e.g.,* Alaska Stat. 39.90.100–.150; Ariz.Rev.Stat. § 38–532; Haw.Rev.Stat. §§ 378–62 & 378–63; Idaho Code §§ 6–2101–2109; Or.Rev.Stat. §§ 659A.200–.224; Wash. Rev.Code §§ 42.40.010–.910 & 42.41.010–.902.

This case—and the doctrine it ratifies—thus implicates more than the too-common tendency of well-intentioned jurists to squeeze a policy-oriented square peg into a round constitutional hole. For despite the majority's paean "to the orderly function-

ing of the democratic process," Maj. Op. at 1175, I fear that *Roth* and its progeny actually pose something of a challenge to the concept of representative democracy itself. More than one hundred years ago, James Bradley Thayer explained:

> The exercise of [judicial review], even when unavoidable, is always attended with a serious evil, namely, that the correction of legislative mistakes comes from the outside, and the people thus lose the political experience, and the moral education and stimulus that comes from fighting the question out in the ordinary way, and correcting their own errors. The tendency of a common and easy resort to this great function, now lamentably too common, is to dwarf the political capacity of the people, and to deaden [their] sense of moral responsibility. It is no light thing to do that.

James Bradley Thayer, *John Marshall* 103–04, 106–07 (1901), *quoted in* Alexander Bickel, *The Least Dangerous Branch* 22 (2d ed.1986). In this case, of course, the majority has not struck down an unwise enactment; instead, it has rendered utterly superfluous a bevy of wise ones. With such Platonic Guardians,[4] who needs elected representatives at all?

### E

Properly understood, *Connick* teaches that although speech uttered by public employees must address an issue of public import in order to come within the protective shelter of the First Amendment, satisfaction of such a virtually necessary condition is not by itself sufficient to trigger constitutional constraints on governmental action. Instead, employee speech solicits the protection of the First Amendment only when it also results from the employee's decision to express his or her *personal* opinions—that is, those views he or she holds *as a citizen* and not as a public

employee. The First Amendment, in short, does not protect public employees' routine and required speech on behalf of the government.

### IV

Our jurisprudence concerning the free speech rights of public employees is now frayed at both ends. While the panel's decision in this case was still pending, another three-judge panel of this court ruled that a police officer's sale of home videos depicting him "alone, with his face partially masked, taking off a generic police uniform and masturbating," *see Roe*, 356 F.3d at 1110, fell sufficiently within the ambit of the First Amendment that the City of San Diego's decision to terminate his employment was subject to balancing under *Pickering* and *Connick*. Remarkably, that panel so ruled notwithstanding the fact that such pornographic displays "may not be honestly considered 'as relating to any matter of political, social, or other concern to the community.' " *Roe*, 356 F.3d at 1128 (Wardlaw, J., dissenting) (*quoting Connick*, 461 U.S. at 146, 103 S.Ct. 1684).

Between *Roe* and *Roth*, the Ninth Circuit now provides that a public employee's speech will be given some degree of First Amendment protection even when it is not based in some personal interest (as opposed to that of the government itself) and even if it fails to touch upon matters of public import (as opposed to those that are purely private). With this lethal combination, the twin pillars of *Pickering* and *Connick*—that speech by public employees must stem *both* from some individual interest *and* address a matter of public import in order to merit constitutional protection—have been felled.

4. *See* Learned Hand, *The Bill of Rights* 70 (1958).

**1194**

While the court quite properly applies *Roth* as binding precedent in this case, the time has come for us to reappraise our jurisprudence concerning the free speech rights of the publicly-employed and the scope of legitimate governmental regulation in its capacity as employer. Because *Roth* is inconsistent with *Connick's* careful differentiation between public employees' speech as citizens and speech in their role as employees, I believe that *Roth* should be overruled—if not by our court sitting en banc, then, in due course, by the Supreme Court, to steer this court's drifting First Amendment jurisprudence back to its proper moorings.